No. 47,843

*In re* Inquiry Relating to RICHARD J. ROME, Magistrate Court Judge.

(542 P. 2d 676)

Opinion filed November 8, 1975. ■■■■■■

*Richard J. Rome,* of Hutchinson, argued the cause and was on the briefs *pro se.*

*Edward G. Collister, Jr.,* of Lawrence, argued the cause and was on the brief for the Commission on Judicial Qualifications.

*Per Curiam:* This is an original proceeding in discipline against the Honorable Richard J. Rome, Judge of the Magistrate Court of Reno county. The Commission on Judicial Qualifications found that respondent Judge Rome, in issuing a written memorandum decision in a criminal case before him, had violated Canon 3 A. (3) of the Code of Judicial Conduct, for which it recommended that he be publicly censured. Judge Rome rejected the commission's finding and recommendation and the matter is here for determination.

The rule which respondent is charged with violating is a part of the code of judicial conduct adopted by this court effective January 1, 1974. It provides:

"CANON 3

*"A Judge Should Perform the Duties of His Office Impartially and Diligently*

". . . His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

"A. *Adjudicative Responsibilities.*

. . .

"(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity. . . ." (Rule No. 601, 214 Kan. xciv-xcv.)

The evidence before the commission on judicial qualifications consisted of exhibits stipulated to by its examiner and respondent, plus the testimony of respondent.

On January 30, 1974, a woman was arrested in the south part of Hutchinson and charged with agreeing to perform an act of sexual intercourse for hire. Her arrest derived from her unwitting solicitation of a Hutchinson police officer to engage her services. Thereafter the defendant made bond for her court appearance. Trial to the court was had on February 26, 1974, in the tribunal presided over by respondent. Defendant was represented by a Hutchinson attorney, Kerry Granger. She was found guilty and given the maximum sentence—six months' confinement in the Kansas correctional institution for women and a fine of $1,000. The defendant then filed a notice of appeal to the district court. The appeal was

subsequently dismissed with her consent and the case was remanded to the magistrate court. There, on May 20, 1974, defendant appeared with her attorney and applied for probation. Respondent took the matter under advisement and on May 23, 1974, he placed the defendant on probation for a period of two years. In addition to filing an order of probation and making routine notations in his docket respondent also filed in the case a written instrument entitled "Memorandum Decision." The writing, which constitutes the subject matter of this proceeding, states (name of defendant deleted):

> This is the saga of _____ _____ _____,
> Whose ancient profession brings her before us.
> On January 30th, 1974,
> This lass agreed to work as a whore.
> Her great mistake, as was to unfold,
> Was the enticing of a cop named Harold.
> Unknown to _____, this officer, surnamed Harris,
> Was duty-bent on _____'s lot to embarrass.
>
> At the Brass Rail they met,
> And for twenty dollars the trick was all set.
> In separate cars they did pursue,
> To the sensuous apartment of _____ _____.
> Bound for her bed she spared not a minute,
> Followed by Harris with his heart not in it!
> As she prepared to repose there in her bay,
> She was arrested by Harris, to her great dismay!
>
> Off to the jailhouse poor _____ was taken,
> Printed and mugged, her confidence shaken.
> Formally charged by this great State,
> With offering to Harris to fornicate.
> Her arraignment was formal, then back to jail,
> And quick as a flash she was admitted to bail.
> On February 26, 1974,
> The State of Kansas tried this young whore.
>
> A prosecutor named Brown,
> Represented the Crown.
> _____ _____, her freedom in danger,
> Was being defended by a chap named Granger.
> Testimony was presented and arguments heard,
> Poor _____ waited for the Judge's last word.
> The finding was guilty, with no great alarm,
> And _____ was sentenced to the Women's State Farm.
>
> An appeal was taken, to a higher court _____ went,
> The thousand dollar fine was added to imprisonment.

Trial was set in this higher court,
But the route of appeal ＿＿ chose to abort.
And back to Judge Rome, came this lady of the night,
To plead for her freedom and end this great fight.
So under advisement ＿＿＿'s freedom was taken,
And in the bastille this lady did waken.

The judge showed mercy and ＿＿＿ was free,
But back to the street she could not flee.
The fine she'd pay while out on parole,
But not from men she used to cajole.
From her ancient profession she'd been busted,
And to society's rules she must be adjusted.
If from all of this a moral doth unfurl,
It is that Pimps do not protect the working girl!

Subsequent to its filing the memorandum decision was widely published by quotation in the local news media, as well as over the state. This publicity evoked complaint against Judge Rome from a feminist group in Hutchinson in the form of a letter to the editor of the Hutchinson newspaper, with copies to bar association and judicial authorities. The burden of the complaint was that the defendant in the case had been held up to public ridicule by Judge Rome. Publication of the protest letter evoked a citation by respondent of its three signers to appear in magistrate court and show cause why they should not be held in indirect contempt of court. The three engaged legal counsel and appeared as directed. There, in an overcrowded courtroom, after voicing his views on the prostitution problem in the city of Hutchinson, respondent dismissed the contempt charges. The whole matter eventually reached the commission on judicial qualifications and this proceeding ensued.

In defending himself before the commission respondent raised jurisdictional as well as other issues, which were decided adversely to his position, and he renews all of them here.

Respondent challenges the jurisdiction of the commission and of this court to act at all under the particular circumstances of this case. He first points out the provisions of two statutes which were in effect on May 23, 1974, when he wrote the memorandum decision in question, providing a method of removal of county judicial officers. The first, K. S. A. 19-2609, provides:

"If any board of county commissioners, or any commissioner, or any other county officer, shall neglect or refuse to perform any act which it is his duty to perform, or shall corruptly or oppressively perform any such duty, he shall forfeit his office, and shall be removed therefrom by civil action in the manner provided in the code of civil procedure."

A magistrate court judge is paid from county funds and may properly be considered a county officer for the purpose of this discussion.

A second method of removal was contained in K. S. A. 1973 Supp. 20-2544. This section, part of an act providing for the establishment of a magistrate court in certain-sized counties which includes Reno county, contained this proviso:

"Should any such judge violate any of the provisions of this or any other section of this act, he shall, upon trial and conviction thereof, be judged guilty of malfeasance in office and his tenure of office shall immediately cease and he shall be further removed therefrom. . . ."

This quoted language was removed by the legislature effective January 13, 1975 (Laws 1974, Chap. 361, § 18).

Respondent further points out that section 16 of article 3 of our state constitution expressly provides that nothing contained in the recent amendment to that article, which establishes a unified court of justice, shall repeal any statute relating to the judge of any court and that such statutes shall remain in force and effect until amended or repealed by the legislature. Respondent's argument is that the two quoted statutes, both in effect at the time of his alleged impropriety, provide the exclusive method for his removal from office. He says he can only be removed for malfeasance in office after trial and conviction in district court and that this court cannot do indirectly through article 3 that which must be done directly under the quoted statutes.

Section 1 of article 3 of our constitution as amended by the electorate in 1972, provides for one court of justice, divided into one supreme court, district courts and such other courts as are provided by law. The magistrate court of Reno county falls in this latter category. Section 15 of article 3 provides:

"*Removal of justices and judges.* Justices of the supreme court may be removed from office by impeachment and conviction as prescribed in article 2 of this constitution. In addition to removal by impeachment and conviction, justices may be retired after appropriate hearing, upon certification to the governor, by the supreme court nominating commission that such justice is so incapacitated as to be unable to perform adequately his duties. *Other judges shall be subject to retirement for incapacity, and to discipline, suspension and removal for cause by the supreme court after appropriate hearing.*" (Emphasis supplied.)

To assist this court in the exercise of its responsibility under section 15 of article 3 the commission on judicial qualifications was created and a procedure established to process complaints against

judicial officers other than supreme court justices (Rules 602-629, 214 Kan. civ-cix).

Thus it appears that at the time of the alleged impropriety three methods of removal of a magistrate court judge existed—by action under the two statutes quoted and under our rules relating to judicial conduct. Although removal from office has not been contemplated by anyone in this proceeding respondent's point should be dealt with. It has been settled law in this state that where there is direct conflict between a statutory and a constitutional provision, the latter will prevail (*Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P. 2d 877). Here the constitution expressly provides for retention of any statutes relating to any judge; hence, there is no real conflict. The various methods of removal of a magistrate judge, both statutory and constitutional, then, are cumulative and each is to be given effect where possible. The result is, a judge of a magistrate court is subject to discipline, suspension and removal for cause by this court after appropriate proceedings before the commission on judicial qualifications.

Respondent also asserts in bar of this proceeding the "prior term" doctrine, under which it has sometimes been held that an officer may not be removed from office for misconduct occurring during a prior term of that office. The basis for the assertion here is that the memorandum decision was written May 23, 1974, and in November, 1974, respondent was elected to and is now serving a new term of office commencing in January, 1975. This court has considered the doctrine before. Although our earlier cases reached a different result, our more recent ones, on varying degrees of distinction from the earlier cases, have held that a public officer could be removed from his office for misconduct committed during a prior term, where the penalty was justified by the circumstances of the case (see *State v. Millhaubt,* 144 Kan. 574, 61 P. 2d 1356; *State, ex rel., v. Harvey,* 148 Kan. 166, 80 P. 2d 1095; *State, ex rel., v. Schroeder,* 199 Kan. 403, 430 P. 2d 315, all discussed at anno: 42 A L R 3d 717-719).

The "prior term" rule seems particularly inappropriate where judicial personnel are concerned. Judges play an unusual role in society today and more is expected of them than of other public officers. The purpose of a judicial disciplinary proceeding is not to punish a judge for misconduct but rather to protect the public in maintaining the integrity and efficiency of the office. To that

end it makes little difference whether a wrongful act has been committed in a present or a prior term of office. The inquiry generally is, in a sense, into the fitness of the person to have the office. Our holding then is that the acts or omissions of a judge committed during a prior term of office may be considered in determining whether removal or disciplinary measures are warranted against the judge.

Respondent further urges he has been denied his right to trial by jury to determine whether he was guilty of malfeasance in office. The right to jury trial as guaranteed by the state constitution (BR 5 and 10) and the federal constitution (6th, 7th and 14th amendments) extends only to cases where the right existed at common law (*State v. Lee,* 113 Kan. 462, 215 Pac. 299). A disciplinary proceeding under section 15 of article 3 does not stem from the common law nor is it criminal in nature. As was said by the supreme court of Maryland, a judicial disciplinary action is ". . . merely an inquiry into the conduct of the judicial officer the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual . . ." (*In re Diener and Broccolino,* 268 Md. 659, 670, 304 A. 2d 587, 594).

No determination of criminal guilt is made in a judicial disciplinary proceeding, only a judgment of judicial fitness or propriety. In this respect the proceeding is analogous to one instituted to discipline a lawyer. In *In re Burnette,* 73 Kan. 609, 85 Pac. 575, this court noted that a disciplinary proceeding against a lawyer is not a criminal action nor a case involving punishment of a person but is a special proceeding stemming from the judicial duty to protect the courts, the legal profession and the administration of justice. There is no entitlement to the right to jury trial in a judicial disciplinary proceeding.

Respondent, without any showing of prejudice, raises other procedural niceties which he says deprived him of due process of law when the matter was before the commission. But for one they are picayune in nature and merit no discussion. The one deserving of mention is the general allegation that the commission's combined functions of investigation, fact-finding, prosecution, judge, jury and "assistant executioner of a sentence" in effect served to deny him an impartial tribunal. A similar contention was advanced in *In Re Hanson,* 532 P. 2d 303 (Alaska), a disciplinary proceeding against a superior court judge. In rejecting the contention the court noted that procedures similar to those in Alaska wherein an agency served

a dual function of investigation and adjudication were in effect in at least twenty-four states. The court said:

"Regarding petitioner's contention, the Commission points out that procedures similar to Alaska's are currently in effect in at least twenty-four states and the District of Columbia. Research discloses that petitioner's due process argument has been rejected by all courts which have considered the question. [Citations] These courts have elected to adopt the majority position as stated by Professor Davis in his treatise on administrative law. According to Professor Davis,

"State courts, like federal courts, generally hold, with only occasional exceptions, that due process does not forbid the combination with judging of such functions as prosecuting, investigating and accusing. . . . . 2 K. Davis, Administrative Law § 13.02, at 181 (1968)." (p. 306.)

See also *Withrow v. Larkin,* 421 U. S. 35, 43 L. ed. 2d 712, 95 S. Ct. 1456.

We think that reposal in the commission of the dual functions of investigation and making findings and recommendations to this court does not result in a biased or partial tribunal violative of a judge's constitutional procedural rights. The commission's findings and recommendations are advisory only. The ultimate authority in disciplinary matters affecting judges other than justices of the supreme court, both as to fact-finding and disposition, remains in this court (Rule 625 (*c*), 214 Kan. cviii). Our review of the entire record discloses no irregularity resulting in a denial of due process rights.

Respondent urges that his first amendment right to freedom of speech will be infringed if he is disciplined for the form and manner of his memorandum decision. Although a judge has the right of free speech, that right, like those of nonjudicial persons, is not without limits. In taking his office a judge assumes added responsibilities and is held to a higher standard of conduct than the lay person. For a judge the right to speak freely is circumscribed by the code of judicial conduct, just as that of the lawyer is subject to the code of professional responsibility, and first amendment rights do not exempt a judge from discipline for proven judicial misconduct.

Respondent next contends his writing and publication of the memorandum decision placing the defendant on probation was an act of judicial discretion and since the remedy for correcting an abuse of discretion is by appeal, such act cannot be the subject of disciplinary proceedings. It is well settled, of course, that a judge is not subject to discipline for exercising his discretion in performing a judicial act, even if his decision be erroneous (*In re Laughlin,*

153 Tex. 183, 265 S. W. 2d 805, appeal dismissed, 348 U. S. 859, 99 L. ed. 677, 75 S. Ct. 84; *In re McGarry*, 380 Ill. 359, 44 N. E. 2d 7). However, not every act of a judge done in the performance of his duty is an act of judicial discretion. As was said in *Bar Assn. v. Franko*, 168 O. S. 17, 151 N. E. 2d 17:

"Although it is quite true that a mere mistake in the exercise of judicial discretion by a judge is not and should never be the cause or subject of a disciplinary proceeding under the Canons of Judicial Ethics prescribed by this court, we must call attention to the fact that not everything a judge does in connection with his judgeship can be said to be an exercise of his 'judicial discretion.'" (p. 30.)

Respondent is not being subjected to disciplinary proceedings because he wrote and filed a memorandum decision in poetic form but because of the particular manner in which it was written, that is, allegedly holding out a litigant to public ridicule or scorn. It is clear that canon 3 A., mandating that a judge be patient, dignified and courteous to litigants with whom he deals in his official capacity, relates to the manner in which a judge conducts his court rather than to rulings or judgments made about which a contention might arise as to abuse of judicial discretion. In the strictest sense it does not deal with the exercise of judicial discretion. But in the manner of exercising judicial discretion a judge still is governed by the provisions of canon 3 A. no matter what his decision on the merits of a matter might be. He has discretion to write an opinion the way he chooses but that discretion must be exercised within the framework of the judicial code generally and canon 3 A. (3) in particular. Respondent's use of the particular manner of writing cannot be said to be the exercise of judicial discretion that is correctable only by appeal.

Respondent finally urges there is no clear and convincing evidence to support the commission's finding and conclusion that he violated canon 3 in issuing the memorandum decision. Although our rules are silent on the quantum of proof necessary, we agree that in a proceeding of this kind it should be greater than that required in an ordinary civil action, *i. e.*, preponderance of the evidence, and further that an appropriate standard is proof by clear and convincing evidence. In so grave a matter as depriving a judge of his office or subjecting him to some form of discipline the burden of proof should be no less, and we so hold.

Is the evidence here of such character as to sustain the conclusion reached by the commission? As already indicated the evidence

in the record consisted of exhibits stipulated to by the examiner and respondent, plus respondent's testimony and in a sense the facts may be said to be undisputed so there is little reason for deference to the commission's superior opportunity to resolve sharply conflicting factual disputes. Respondent, who has served as city attorney, as deputy county attorney and county attorney in his home county, and is a respected member of the Kansas bar practicing law in Hutchinson, testified as to his concern about the problem of prostitution in a particular area of Hutchinson: Prostitutes or their pimps were openly accosting people on the streets or waiting for stoplights; some prostitution cases had been tried in police court; he gave the maximum sentence in the defendant's case; his concern was "to jolt the south end and, more particularly, the pimps" and the memorandum decision was used "to get that point across"; he had no intent to degrade or ridicule the defendant; neither she nor her parents made complaint to him about the memorandum; her case had been previously publicized by the news media; he believed that women have been treated unfairly under our sex laws; he did not believe a judge should be denied the privilege of writing an opinion in poetic form.

Respondent cites several cases in which the decision was written in poetic form and argues he should not be chastized for doing that. He has not been proceeded against, nor found derelict, for use of the poetic form. The complaint is that in his decision he held the defendant up to public ridicule or scorn.

Judges have long been enjoined from the use of humor at the expense of the litigants before them for reasons which should be apparent. Under the heading of "Ancient Precedents" in the canons of judicial ethics adopted in 1924 by the American Bar Association this appears:

" 'Judges ought to be more learned than witty; more reverend than plausible; and more advised than confident. Above all things, integrity is their portion and proper virtue.' . . .

" 'Patience and gravity of hearing is an essential part of justice; and an over speaking judge is no well-tuned cymbal. . . .'—Bacon's Essay 'of Judicature.' " (198 Kan. xi.)

In 1967 a long time member of the supreme court of Arkansas in advising new judges on opinion writing had more to say on the subject. We quote:

"Judicial Humor

". . . Judicial humor is neither judicial nor humorous. A lawsuit is a

serious matter to those concerned in it. For a judge to take advantage of his criticism-insulated, retaliation-proof position to display his wit is contemptible, like hitting a man when he's down." (Smith, *A Primer of Opinion Writing, For Four New Judges,* 21 Ark. L. Rev. 197, 210.)

Judges simply should not "wisecrack" at the expense of anyone connected with a judicial proceeding who is not in a position to reply. When judges do this the stage is set for an imbroglio like that which apparently occurred after respondent here cited the three objectors for contempt of court, and respect for the administration of justice suffers. Nor should a judge do anything to exalt himself above anyone appearing as a litigant before him. Because of his unusual role a judge should be objective in his task and mindful that the damaging effect of his improprieties may be out of proportion to their actual seriousness. He is expected to act in a manner inspiring confidence that even-handed treatment is afforded to everyone coming into contact with the judicial system.

Our reading of this memorandum decision leads to the conclusion the defendant in the prostitution case was portrayed in a ludicrous or comical situation—someone to be laughed at and her plight found amusing. She was referred to throughout in terms designed to evoke chuckles over her activities. Her own integrity as an individual, convicted of a crime though she was, was disregarded. The fact that neither she nor her parents made complaint is scarcely persuasive that she was not held out as a subject for public amusement. Respondent may not have intended to ridicule her or hold her out to public scorn yet that appears to be the effect of that which was done. Publicity about the memorandum was obviously expected.

Our code of judicial conduct and its implementing rules deal with a wide range of problems of varying degrees of seriousness. This particular proceeding does not present one of the greatest magnitude. Neither venality nor criminality is present nor can it be said the memorandum decision was written with deliberate intent to harm anyone. Yet, everything considered, we believe a violation of the canon in question has been shown. A litigant was not afforded the kind of treatment mandated.

It is therefore ordered that respondent Richard J. Rome be and he is hereby censured by this court. He is further ordered to pay the costs of this proceeding.

MILLER, J., not participating.