In the Matter of the Removal of Earl R. JOHNSON, Jr., a Justice of the Peace within and for Natrona County, Wyoming.

JPR No. 2.

Supreme Court of Wyoming.

Aug. 15, 1977.

Richard G. Miller of Miller & Miller, Casper, filed written brief and appeared in oral argument for Earl R. Johnson, Jr.

Arnold B. Tschirgi, Fremont County Pros. Atty., Lander, who was designated to present the complaint, filed written brief but did not appear in oral argument.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

Earl R. Johnson, Jr., respondent herein, was first appointed a justice of the peace for Natrona County, Wyoming, on July 9, 1970. On January 28, 1976, an investigator for the Casper Police Department filed a written complaint against the respondent alleging certain acts of misconduct. Pursuant to Rule 5(c), Wyoming Administrative Rules, Justice of Peace Courts (W.Adm.R.J.C.), we convened a three-judge hearing panel of district judges to investigate the alleged grounds for removal of the respondent, as justice of the peace, and to determine whether a hearing on the charges should be held. Based upon the investigation, the panel determined that such a hearing should be held, and respondent was served with a written notice of the charges for his removal and the time and place for hearing, on August 9, 1976. After a hearing on October 21 and 22, 1976, the three-judge panel rendered its findings of fact and conclusions of law on January 3, 1977. The panel's report set forth 14 separate findings of fact,[1] and concluded that the

---

1. We find it advisable to set out these findings in their entirety:

"FINDINGS OF FACT

"1. Earl R. Johnson, Jr. has been a justice of the peace in and for Natrona County, Wyoming from July, 1970 until the present time.

"2. About February 18, 1972, Earl R. Johnson, Jr., drove an automobile into a private house occupied by Mr. and Mrs. Don Knerl. Mr. and Mrs. Don Knerl were at home. Earl R. Johnson, Jr., thereafter left the scene of the accident without notifying the persons present in the dwelling. Earl R. Johnson, Jr. did not report the accident to the proper authorities. Two charges were filed against Earl R. Johnson, Jr. in Casper Municipal Court based on these facts. Earl R. Johnson, Jr. entered a plea of nolo contendere to both charges.

"3. In November, 1974, Earl R. Johnosn [sic], Jr. refused to give an officer of the Casper Police Department who was investigating a disturbance call at an apartment in which Earl R. Johnson, Jr. was present in Casper, his name or identification although the officer requested the same and was in uniform.

"4. About May 23, 1975, Earl R. Johnson, Jr. on a street in Casper, Wyoming, said to Sheriff's Officer Ron Ketchum, 'I am a Judge'. Earl R. Johnson, Jr. then directed Sheriff's Officer Ketchum to arrest Don Flagg without a warrant for an alleged grand larceny, at which time and place the said Earl R. Johnson, Jr. was an attorney employed in his private capacity for the party claiming to be the owner of the alleged stolen goods. At the time this direction was made by Earl R. Johnson, Jr., he was holding a can of beer in his hand and was talking in a very loud manner. The officer, Ron Ketchum, believed the complaint to be a civil complaint. The officer refused to arrest Don Flagg without a warrant. The officer investigated the complaint and sought the advice of the Natrona County Attorney's office. The officer never received a warrant for Don Flagg's arrest; and did not arrest him.

"5. It is a policy in the office of Justice of the Peace Earl R. Johnson, Jr. that in contested litigation which is set before him for hearing, that Justice Johnson is not normally present when all parties and their attorneys are present at the time set, but will thereafter come from his private law office in another building away from the courthouse after notification by his office staff by phone. This policy has been established at the direction of Earl R. Johnson, Jr.

"No explanation has been given in the past by Justice Johnson to the litigants or attorneys involved in the cases when he arrives after the scheduled appearance time. Justice of the Peace Earl R. Johnson, Jr.,'s own explanation for these occasions is that other legal business sometimes of a private nature, has caused it to be inconvenient or impossible for him to be present at the times set for hearings in his Court. This panel finds that Justice Johnson has not always given priority to Justice of the Peace business over his own private practice. Earl R. Johnson, Jr., also acknowledges the office policy mentioned in this paragraph.

"6. Justice of the Peace Earl R. Johnson, Jr. does occasionally tell risque jokes before female employees of the Justice of the Peace Court; and has on one occasion rapped one of them on the buttocks with a book.

"Justice Johnson does not intend to be offensive by these mannerisms and considers the same to be proper, because he knows that the female employees in the Justice of Peace office, with one or two exceptions, have told risque stories among themselves; and are not therefore offended by his stories.

"7. Justice of the Peace Johnson is casual in his dress in and about the Justice of Peace chambers and offices. Earl R. Johnson, Jr. has been told by Loretta Sellers, a long time employee of the Justice of Peace Courts in Casper, that Earl R. Johnson, Jr.'s dress and appearance is sloppy and unjudicial. Justice of the Peace Johnson almost always appears

respondent was not guilty of three of the

in his Court in a robe, although not always with a tie. Justice of the Peace Johnson considers his dress to be appropriate, because he believes what he does in his chambers is his own business. He also considers the fact that he does not always wear a tie in the courtroom excusable because his physical dimensions do not always make it convenient for him to wear a tie.

"8. In July 1975, Earl R. Johnson, Jr. was present in the Country Kitchen restaurant in Casper about 4 A.M. Earl R. Johnson, Jr. says he was 'out of sorts' because of having just gotten out of bed. A Casper police officer present at the time says Earl R. Johnson, Jr. was drunk. Earl R. Johnson, Jr. did engage in a conversation with a female employee, about age 16, at the Country Kitchen. This conversation was in the presence of two law enforcement officers, Jack L. Macy and Sgt. Schilling of the Casper Police Department. It is unlikely that Judge Johnson knew these two men were present. The conversation by Johnson's admission contained some strong language; and there is nothing in the record to contradict one of the policemen's testimony that the conversation was essentially as follows:

"Johnson: Are you going to vacuum this floor?

"Employee: Yes, I am.

"Johnson: No, you are not.

"Employee: Yes, I am. I have to get my sidework done.

"Johnson: You are not going to run that god damned vacuum while I am in here. If you want to run that son of a bitch, you are going over to the other side and run it. Either that or you can open up that section over there, and I'll eat my god damned breakfast over there. If you insist on running that god damned thing here, I'll take it, and show you where you can put it.

"9. About November 23, 1975, Earl R. Johnson, Jr. appeared at the Country Kitchen restaurant in Casper in the early morning. Johnson was in the presence of his wife; Johnson was at least 'mildly intoxicated'. Johnson said to Annette Bowen Anderson, age 18, the waitress who waited on him, 'You have a nice ass.' Johnson touched the waitress at least one time. Johnson offered to pay the waitress at the table, and was told by the waitress that the restaurant rules require that checks be paid at the cash register. Johnson was upset because the waitress would not take the money at the table. Johnson went to the cash register, tore his ticket in half and scribbled his address on half of the ticket. Johnson told the waitress, 'If you want to get your money, you will have to come here,' indicating the address, 'and ask for it.' Johnson left the restaurant; the waitress reported this incident to the assist-

grounds for removal as set forth in Rule

ant manager, Tom Heinle. Tom Heinle ran out of the restaurant and saw Johnson in a pickup truck. Johnson locked the pickup truck door. Johnson rolled the window part way down. Heinle asked Johnson, 'Are you going to pay?' Johnson said, 'The only way you are going to get your money is to have that bitch waitress come to my place and beg for it.' Johnson backed up his pickup swinging the front end toward Heinle causing him to have to jump out of the way. About 30 minutes later Johnson called Heinle on the phone. Heinle thought the caller said, 'This is Jud Johnson.' Earl R. Johnson, Jr. then said to Heinle on the phone, 'The only way you are going to get your money is to have that bitch waitress come up to my place and beg me for it. I never have paid any woman for her services.'

"The pickup was registered to a corporation. Sheriff's Officer, Ron Ketchum traced the pickup registration to Earl R. Johnson, Jr. Ron Ketchum contacted Johnson by phone. Johnson told Ron Ketchum on the phone, 'It was me in the pickup. If they want their money, they'll have to come here and ask me for it. I'm not going down there.' About January 15, 1976, Johnson sent a cashier's check to the restaurant in payment of the bill that he had not paid on November 23, 1975. He also sent a letter of explanation of the incident which accompanied the payment.

"10. Justice Johnson does not consider his conduct at either of the Country Kitchen incidents to be improper. He explains his conduct by saying that it is his attitude that the customer is always right; that if a customer is displeased, he may express his displeasure even to the extent and in the manner that Earl R. Johnson, Jr. did in the two Country Kitchen incidents.

"11. About March 16, 1975, Justice Johnson was the defendant in a trial in which Oil City Corporation of Casper sought to recover from him for nonpayment of rent for his office space. Following the trial Justice Johnson went to several bars or lounges in Casper.

"Martin Sanchez was a witness in the Oil City Corporation v. Johnson case. Martin Sanchez is a friend of Justice Johnson. Martin Sanchez is a man about 50 years old, about 5' 7" in height and 190 pounds in weight. Justice Johnson is in his thirties, 6' 3" and 230 pounds in weight. Martin Sanchez was intoxicated. Martin Sanchez according to Earl R. Johnson, Jr. at this time was a sick man with long standing chronic alcoholic problems. Martin Sanchez offended Earl R. Johnson, Jr. and his party at the Moose Club, finally causing Justice Johnson to take Martin Sanchez outside on the sidewalk in front of the Moose Club, a situation in which either party was free to leave. Mar-

5(b), W.Adm.R.J.C.,[2] but was "shown by the evidence to be guilty of conduct prejudicial to the administration of justice or that brings the judicial office into disrepute." It now is our obligation, under Rule 5(b), W.Adm.R.J.C., supra, to consider the applicable law—the record—and to then make a disposition concerning the removal or retention of Earl R. Johnson, Jr., as a justice of the peace.

## GROUNDS FOR REMOVAL

██ Since this is a case of first impression with respect to the removal of a judicial officer in Wyoming, we find it necessary to dispose of certain preliminary matters before reaching the merits of this removal action. In response to this court's order to show cause why removal from office should not be decreed, respondent contends that he cannot be removed from office on grounds other than those contained in Article 3, § 19, Constitution of Wyoming. Article 3, § 19, supra, provides:

"All officers not liable to impeachment shall be subject to removal for *misconduct or malfeasance in office*, in such manner as may be provided by law." [Emphasis supplied]

Respondent reasons that since the hearing panel found him not guilty of "wilful and persistent failure to perform his duties" and of "wilful misconduct in office," this court has no power to remove him from his office. Justice Johnson's argument is further premised on the contention that § 5–99.8, W.S.1957, 1975 Cum.Supp.,[3] which vests this

---

tin Sanchez lunged at Justice Johnson. Justice Johnson struck Martin Sanchez in the face with his fist knocking Sanchez down on the sidewalk. Martin Sanchez got up, advanced agressively [sic], and Johnson struck him again in the face, knocking him to the sidewalk a second time. Martin Sanchez again got up and advanced toward Johnson a third time and again was knocked to the sidewalk.

"Justice Johnson admits to having been drinking, but claims not to have been under the influence of intoxicants to any great degree at this time.

"The Casper Police Department was notified of this incident by a third party, probably the manager of the Moose Club. Police Officer Larry Ayers heard Justice Johnson say to him, 'Marty has been following me around. I don't know whether it is a sexual advance or what, but I had to deck him.' Later the same police officer heard Justice Johnson say to him, 'Get that ass hole out of here before I stomp his butt,' and still later heard Justice Johnson say to him, 'I love Marty, and if he needs a bond, I'll put it up and beat his ass again.'

"Justice Johnson made no attempt to call any law enforcement personnel in connection with the problem with Sanchez for the reason that Sanchez was his friend, and he felt that Sanchez would be put in the drunk tank, and would suffer physically therefrom.

"12. On the 6th day of March, 1976, Civil Judgment was rendered from the bench for Oil City Corporation against Earl R. Johnson, Jr. for nonpayment of rent in the approximate amount of $1800. Judgment was not formally entered in this case until June, and was then entered without Justice Johnson approving the form of the Judgment. No post judgment proceedings were taken by Earl R. Johnson, Jr. No attempt was made to pay any part of this Judgment until about October 1, 1976 when Justice Johnson paid the Judgment in full.

"13. Justice Johnson has, and does now, accept clients accused of criminal activities, both felony and misdemeanor. His employment by such clients in his capacity as an attorney in private practice is of sufficient regularity that he is considered to be one of the leading defense counsel, particularly in Municipal Court appearances, of the Natrona County Bar. This activity of representing criminal defendants by Earl R. Johnson, Jr. has been practiced during the same period of time that he has acted as Justice of the Peace and in such official capacity has been called upon to judge those defendants appearing before him who are charged with misdemeanors.

"14. Earl R. Johnson, Jr. admitted to District Judge R. M. Forrister that he had been on the bench in his capacity as a Justice of the Peace while he had been drinking on at least one occasion."

2. Rule 5(b), W.Adm.R.J.C., provides:

"A justice of the peace may be removed for wilful misconduct in office, or wilful and persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice or that brings the judicial office into disrepute. He may also be removed for any disability seriously interfering with the performance of his duties which is likely to become a permanent character."

3. Section 5–99.8, supra, provides:

"The supreme court of Wyoming is hereby vested with disciplinary powers over justices of the peace. The supreme court of Wyo-

court with disciplinary powers over justices of the peace, does not give us power to create new and different grounds for removal in addition to those enumerated in Article 3, § 19, supra. It has been stated that

". . . it appears to be the rule in many states that any power existing in a state court to remove a state judge from office must be based upon express constitutional provisions or upon valid statutory enabling provisions enacted thereunder. . . ." 53 A.L.R.3d 882, 894.

We agree with that statement of the law, while at the same time finding that the grounds for removal of a justice of the peace are no longer limited to those contained in Article 3, § 19, supra.

This court set forth the general rule in *People ex rel. Emerson v. Shawver,* 30 Wyo. 366, 222 P. 11, 29 (1924):

". . . That the Legislature is without power as to this office, *so created by the Constitution,* to add to the causes for removal therein [Article 3, § 19, supra] specified. . . ." [Emphasis and bracketed matter supplied]

We went on in *Sahwver* to cite with approval the case of *State v. Prater,* 48 N.D. 1240, 189 N.W. 334, wherein it was stated:

" 'This legislative power of removal concerning a public office *created by statute* [italics ours] is not subject to the restrictions of the constitutional provisions concerning the removal of certain officers by impeachment or other officers upon stated grounds.' " [Emphasis and bracketed matter from text]

The essential determination to be made then, is whether the office of justice of the peace is a constitutionally-created or legislatively-created office.

In order to come to this decision, several constitutional provisions must be considered. Prior to its amendment by the people, proclaimed effective January 17, 1967, Article 5, § 1, of the Wyoming Constitution, provided:

"The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, *justices of the peace,* courts of arbitration and such courts as the legislature may, by general law, establish for incorporated cities or incorporated towns." [Emphasis supplied]

Senate joint Resolution No. 1, Session Laws of Wyoming, 1965, p. 518, authorized the submission of the following amendment to this section, which was adopted by vote of the people at a general election:

"The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, and such subordinate courts as the legislature may, by general law, establish and ordain from time to time."

In addition to amending Article 5, § 1, supra, the constitutional amendment also provided for the repeal of Article 5, §§ 22 and 23, of the Wyoming Constitution, relating to the jurisdiction and election of justices of the peace and to appeals from justices' courts. Senate Joint Resolution No. 1, Session Laws of Wyoming, 1965, p. 519. It was further resolved that the following statement be endorsed on the proposed amendment by the Secretary of State of the State of Wyoming:

"*Our state constitution establishes and prescribes the jurisdiction of justice of the peace courts;* also, it gives the legislature authority to establish municipal and arbitration courts. *This proposed amendment, if adopted, would eliminate all such courts from the constitution* and, instead, would give the legislature the authority to establish the subordinate courts it deems best suited to our modern needs and provide for their jurisdiction and manner of functioning. In the meantime, the present system would continue in effect under existing statutes

ming shall, by rule of the supreme court, establish procedures concerning notice, opportunity to be heard, and discipline to be imposed, in furtherance of such disciplinary

powers. Said disciplinary powers shall include the power to remove a justice of the peace from office for cause. (Laws 1971, ch. 214, § 8.)"

until changed by the legislature." [Emphasis supplied]

This short review of the justice of the peace court system permits us to reach several conclusions. First, at one time the justice of the peace court and, as a result, the office of justice of the peace, were of constitutional origin in Wyoming. *Ballantyne v. Bower,* 17 Wyo. 356, 99 P. 869, 871 (1909). Second, the people of Wyoming have eliminated the justice of the peace courts from the constitution, by constitutional amendment. It is true that usually the office of justice of the peace is considered to be a constitutional office—as was once the case in Wyoming. *In re Bowman,* 225 Pa. 364, 368, 74 A. 203, 204 (1909). It is now, however, a creature of statute and, therefore, not subject to the constitution's removal provisions. Our inquiry would end at this juncture were it not for the existence of other apparently inconsistent constitutional provisions.

■ Article 3, § 18, of the Constitution of Wyoming provides:

"The governor and other state and judicial officers *except justices of the peace,* shall be liable to impeachment for high crimes and misdemeanors, or malfeasance in office, but judgment in such cases shall only extend to removal from office and disqualification to hold any office of honor, trust or profit under the laws of the state. The party, whether convicted or acquitted, shall, nevertheless, be liable to prosecution, trial, judgment and punishment according to law." [Emphasis supplied]

It is arguable, therefore, that if a justice of the peace is not subject to impeachment, then the removal provisions of Article 3, § 19, supra, must be applied, thus limiting the grounds for removal to those specified. We are, however, unable to reach such a conclusion. Constitutional provisions, like statutory provisions, may be repealed or abrogated by implication arising out of the adoption of changes in other constitutional provisions, rendering obnoxious, or ineffective, the original provisions not expressly repealed. *Wright v. Jordan,* 192 Cal. 704,

221 P. 915, 918 (1923); *Egbert v. City of Dunseith,* 74 N.D. 1, 24 N.W.2d 907, 909 (1946); *People v. Field,* 66 Colo. 367, 181 P. 526, 527–528 (1919); *Jackson v. Consolidated Gov. of City of Jacksonville,* Fla., 225 So.2d 497, 500–501 (1969); and 16 C.J.S. Constitutional Law § 7, at p. 35. To be sure, such repeals are not favored and will not be given effect unless there is an irreconcilable repugnance between the two provisions. *Moore v. Brown,* 350 Mo. 256, 165 S.W.2d 657, 663 (1942); and *Adams v. City of Hobart,* 166 Okl. 267, 27 P.2d 595, 599–600 (1933). Constitutional amendments, if possible, should be harmonized with other provisions of the constitution, and effect given to the whole instrument and to every section and clause. *Luikart v. Higgins,* 130 Neb. 395, 264 N.W. 903–905 (1936). If the provisions cannot be reconciled, then the subsequent provision shall prevail over the prior provision—even if only a partial repeal by implication is necessary. *Engelking v. Investment Board,* 93 Idaho 217, 458 P.2d 213, 217 (1969).

■ We must ask, then, whether the provisions of Article 3, §§ 18 and 19, supra—as they relate to justices of the peace—are irreconcilable with the 1967 constitutional amendment, affecting Article 5, §§ 1, 22, and 23, supra. The answer to this inquiry necessarily finds its resolve through consideration of the incidents of a legislatively-created office, as opposed to those of a constitutional office. In holding that the office of county assessor was not a constitutional office, we said in *Reals v. Smith,* 8 Wyo. 159, 56 P. 690, 692–693 (1899):

". . . An office, even if it be a constitutional office, may be abolished at any time by a new constitution, or by the amendment of the existing one. *French v. Com.,* 78 Pa.St. 339. The principle is firmly established in the jurisprudence of this country that a public office is not a contract, either express or implied, nor a grant, nor to be regarded as the property of the incumbent. It is also well settled, and we understand it to be conceded, that, in the absence of constitutional restrictions, offices which are legislative

only, and not constitutional, may be abolished or changed at the pleasure of the legislature; and the duties thereof may be increased, or diminished, and the rights and privileges thereof varied, increased, decreased, or abolished. And, in general, subject to constitutional provisions or prohibitions, the authority of the legislature over public offices is complete and absolute. *Lee v. Board,* 3 Wyo. 52, 31 Pac. 1045. Respecting an office not mentioned in the constitution, it was said in Pennsylvania: 'Not having been mentioned by the constitution, the legislature was left with unrestricted power to prescribe what the duties of the office should be, what the length of its tenure, what its emoluments, and how it should be filled. Having the power to create, they have also the power to regulate, and even to destroy. Undoubtedly, the legislature may at any moment repeal the act of 1850, and abolish the office. They may provide a substitute for it. * * * It was never intended to put offices created by the legislature beyond the control and regulation of the creating power . . .' What the people may do by an original or new constitution, the legislature may do with reference to public officers, except as restricted by constitutional provisions. The office of county assessor is not a constitutional office. It is mentioned but once in that instrument, and then only by placing a maximum limit upon the salary which may be paid to such an officer, in connection with like limitations upon salaries for other specifically named county officers; but in the same article it is provided that any county officers performing the duties usually performed by the officers named in the article shall be considered as referred to by the section embracing said limitations, regardless of the title by which their offices may thereafter be designated (Const. art. 14, §§ 3, 5), thus clearly recognizing legislative control over such offices. *The fact that an office is mentioned incidentally in the constitution does not make it a constitutional office, in the sense of being beyond legislative control.* State v. Hermann, 11 Mo.App. 43. It is, moreover, further provided that 'the legislature shall provide by law for the election of such county officers as may be necessary.' Const. art. 12, § 5. This provision expressly delegates to the legislature absolute authority over the matter of the creation of county offices. It is probably true that the section requires such offices as are covered thereby to be made elective by the people, but, as it will appear later on, a decision upon that precise question is not necessary. Such legislative authority, however, is absolute only so far as unrestricted by other constitutional provisions. The only restrictions upon that authority are those found in section 32 of article 3, already alluded to. They prohibit the extension by law of the term of a public officer, and the increase or decrease of his salary or emolument, after his election or appointment. Neither of the acts so prohibited is attempted or accomplished by the statute under consideration. These restrictions of the section last cited, together with the possible requirement that county officers shall be elected (and for the purposes of this case it may be assumed that they are required to be elected), are the only ones controlling the action of the legislature in respect to the creation and regulation of county offices, so far as concerns the questions presented in this case." [Emphasis supplied]

The office of justice of the peace, being a legislative office, can be abolished or changed at the will of the legislature. This being so, the rights and privileges of such an office can likewise be abolished. The provisions of §§ 5–114.4, 5–114.5, and 5–114.7, W.S.1957, 1975 Cum.Supp.,[4] as they

---

4. The cited sections provide:

"§ 5–114.4. Establishment of county court in counties with population more than 30,-000.—The board of county commissioners of any county with a population of more than thirty thousand (30,000) inhabitants according to the latest official decennial census of the United States *shall* establish a county court. County courts hereafter established pursuant hereto shall be established on Janu-

relate to the supplanting of justice of the peace courts by county courts, envision such a possibility. On January 1, 1979, counties with a population of more than 30,000 inhabitants will have no justices of the peace. Section 5–114.77, W.S.1957, 1975 Cum. Supp.,[5] and § 5–114.4, supra.

█ We hold that the authority which the people have vested in the legislature, with respect to the office of justice of the peace—and the appurtenant right to abolish or modify the privileges and rights of such an office—is irreconcilably repugnant to the provisions of Article 3, §§ 18 and 19, supra. This conclusion is further buttressed by the observation that the phrase "other state and judicial officers" contained in Article 3, § 18, supra, refers only to state and judicial officers created by the constitution. Clearly, not *all* state officers are subject to impeachment. *People v. Shawver*, supra, 222 P. at 28–29. It follows, then, that since a justice of the peace is not a state officer in the constitutional sense, the language, "except justices of the peace" contained in Article 3, § 18, supra, is now without meaning. If this language is without meaning,

then the provisions of Article 3, § 19, supra, are no longer applicable to justices of the peace. We hold that these provisions were, therefore, repealed by implication when the 1967 constitutional amendment became effective.

█ The net result of this discussion constitutes a rejection of respondent's argument that the grounds for his removal, as justice of the peace, are limited to those contained in Article 3, § 19, supra. Rather, by virtue of the 1967 constitutional amendment and § 5–99.7, supra, this court has been vested with the power to define the grounds for removal of a justice of the peace. Section 5–99.8, supra, provides in part:

" . . . Said disciplinary powers shall include the power to remove a justice of the peace from office *for cause.*" [Emphasis supplied]

The specific grounds which will justify "cause" for removal are undefined in the statute, leaving this court with the responsibility of defining such grounds as a necessary adjunct to its disciplinary powers.[6]

---

ary 1 next succeeding the year of which such census demonstrates a population of more than thirty thousand (30,000) in the county. (Laws 1971, ch. 261, § 2; 1975, ch. 117, § 1.)" [Emphasis supplied]

"§ 5–114.5. Establishment of county court in counties with population less than 30,000 and municipalities with population of 15,000 or less.—In counties in this state which have a population of less than 30,000, or with a municipality of a population of 15,000 or less, according to the latest official decennial census, the board of county commissioners *may* establish a county court in their county by the adoption of a resolution establishing the same. Within ten days after the adoption of such a resolution the board of county commissioners shall file certified copies of such resolution with the clerk of the supreme court of Wyoming, with the state examiner, and with the clerk of the district court of the county. (Laws 1971, ch. 261, § 3.)" [Emphasis supplied]

"§ 5–114.7. Justice of peace courts supplanted and replaced.—In *any county* in which a county court has been established, said county court shall supplant and replace the justice of peace courts of the county and shall exercise the jurisdiction previously exercised by the justice of peace courts. The provisions of the Wyoming Statutes relating

to justice of peace courts shall have no application in such county, and the county shall be governed by the provisions relating to county courts. (Laws 1971, ch. 261, § 5.)"

5. Section 5–114.77(a), supra, provides:

"In those counties in which the county court system is established, the primary election and general election of 1978 shall be the first elections in which persons shall be nominated for and *elected to the office of judge of the county court,* and the county court system shall become operative on January 1, 1979."

6. "For cause" has been defined as:

" . . . acts 'including corruption, general neglect of duty, *delinquency affecting general character and fitness for office*; acts violative of law inspired by interest; oppressive and arbitrary conduct, reckless disregard of litigants' rights, and acts justifying "the finding that his future retention of office is inconsistent with the fair and proper administration of justice" ' *(Matter of Kane v. Rudich,* 256 App.Div. 586, 587, 10 N.Y.S.2d 929, 930)." [Emphasis in text copied] *In re Sarisohn,* 26 A.D.2d 388, 275 N.Y.S.2d 355, 357 (1966).

There is certainly nothing in Rule 5(b), supra, which goes beyond this general standard.

The adoption of Rule 5(b), supra, represents the exercise of this responsibility.

### MEANING OF RULE 5(b)

▮ The portion of Rule 5(b), supra, with which we are most concerned provides as follows:

> "A justice of the peace may be removed for . . . conduct prejudicial to the administration of justice or that brings the judicial office into disrepute. . . ."

This language is similar to that contained in Article 5, § 6(e)(2), of the Wyoming Constitution[7], which sets forth the grounds for censure or removal of supreme court justices and district judges. The Judicial Supervisory Commission, provided for in Article 5, § 6, supra, is an innovative procedure taken essentially from the California experience having particular reference to Article VI, § 18(c), of the California Constitution. We, therefore, find the California decisions construing this language persuasive. In *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal. Rptr. 201, 209, 515 P.2d 1, 9 (1973), the California Supreme Court made the following observations:

> "As indicated above, the Commission in the instant matter concluded that the conduct proven in the previously discussed specifications constituted 'wilful misconduct in office' and 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' As we have noted above, the second ground for imposing discipline was added to the Constitution in 1966. We believe this mandates our construing 'wilful misconduct in office' as connoting something

graver than the 'lesser included offense' of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to *conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.*[11]

> "[11] The lesser charge of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute' *would also apply to wilful misconduct out of office, i. e. unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity.* It should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for 'conduct prejudicial to the administration of justice which brings the judicial office into disrepute.'" [Emphasis supplied]

In light of the fact that our rules on this matter do not reflect the same history as the California amendment, we do not find that "conduct prejudicial to the administration of justice [or] that brings the judicial office into disrepute" is necessarily a "lesser included offense" of "wilful misconduct in office." We do, however, embrace and subscribe to the meaning which the California court has placed on the language. In other words, it is conduct which includes certain personal activities outside the judicial office. The court in *Geiler* stressed the importance of an objective rather than a subjective appraisal of judicial conduct, and

---

7. Article 5, § 6(e), supra, provides:

 "On recommendation of the judicial supervisory commission the supreme court may (1) retire a justice or judge for disability that seriously interferes with the performance of his duties and is, or is likely to become, permanent and (2) censure or remove a judge for action occurring during, or not more than 6 years prior to the commencement of, his current term that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of

justice that brings the judicial office into disrepute."

Since we find that Rule 5(b), supra, and not Article 3, § 19, supra, sets forth the appropriate grounds for removal, we need not reach respondent's equal-protection argument. This argument was based on the differences between Article 3, § 19, and the above-quoted Article 5, § 6(e). Since respondent is subject to standards substantially similar to those imposed for supreme court justices and district judges, his contention must fail.

noted that the canons of the American Bar Association's Code of Judicial Conduct[8] might usefully be consulted to give meaning to the proscribed standards. *Spruance v. Commission on Judicial Qualifications*, 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209, 1221 (1975). We find this approach more appropriate than the "I know it when I see it" approach apparently utilized by some courts. *In re Diener*, 268 Md. 659, 304 A.2d 587, 594 (1973). See *In re Diener*, supra, at 624–625 (dissenting opinion).

Somewhat related to the types of acts for which a justice of the peace can be removed is the question which asks *when* those acts must occur in order to become grounds for removal. Respondent urges that under Article 3, § 19, supra, the acts of misconduct must have occurred during the officer's current term of office. *State v. Scott*, 35 Wyo. 108, 247 P. 699, 712 (1926). In *Scott* we stated:

"The proposition thus before us is one upon which the authorities are in direct conflict, though we think, and as we proceed will endeavor to show, that the weight of authority and the better reasoning support the view that, with some possible exceptions, acts of a preceding term in the same office are not legal or competent ground for the removal of a public officer, *in the absence of a statute expressly or by fair inference so providing.*" [Emphasis supplied]

This divergence of viewpoint is equally severe in the judicial-removal context. Compare *In re Sarisohn*, 26 A.D.2d 388, 275 N.Y.S.2d 355 (1966); *In re Inquiry Relating to Rome*, 218 Kan. 198, 542 P.2d 676 (1975); and *In re Diener*, supra, 304 A.2d at 596–597, with *State ex rel. Turner v. Earle*, Fla., 295 So.2d 609, 613–619.

█ Rule 5, supra, does not expressly state that a justice of the peace can be removed on the basis of acts occurring during a previous term. We do note, however, that a supreme court justice or district judge can be censured or removed "for action occurring during, or not more than 6 years prior to the commencement of, his current term." Article 5, § 6(e)(2), supra. Whether this court has the authority, by virtue of § 5–99.8, supra, to enact such a rule for justices of the peace is a question which is not before us. Suffice it to say, we have not yet done so, and as a result (*State v. Scott*, supra), we are unable to consider acts occurring in respondent's prior term to be, in and of themselves, grounds for removal. This is not to say, however, that such acts may not be considered as evidential facts bearing upon respondent's general course of conduct during his present term—especially as they relate to motive and intent concerning acts charged to him during his current term. We find such considerations uniquely important in view of the heavy moral, social and professional responsibility demanded of judges in the social order of these times. We must remember that the purpose of this disciplinary proceeding is not to punish a justice of the peace but rather to protect the public in maintaining the integrity of the office.

## REVIEW OF THE FINDINGS

█ With the previously-discussed guidelines in mind, we proceed to a consideration of the record and disposition of the case. Analogous to disciplinary actions against attorneys, this court is vested with the power to discipline justices of the peace. Section 5–99.8, supra. As a result, the three-judge hearing panel of district judges serves only as an arm of the court. See *Mendicino v. Whitchurch*, Wyo., 565 P.2d 460. The findings and conclusions of the panel, therefore, are merely advisory—although they are entitled to the most serious consideration. The findings and rulings herein, however, are those of this court and not of the panel. In reaching these findings and conclusions, we hold the standard of proof in such an inquiry to be proof by clear and convincing evidence sufficient to

8. The Code of Judicial Conduct, with an exception not relevant to the instant case, was adopted by order of this court on September 4, 1973. Rules of the Supreme Court of Wyoming, n. 1.

These rules have the force of law and can be relied on to give meaning to the standards set forth in Rule 5(b), supra.

sustain a given charge with reasonable certainty.[9] Somewhat different from the procedure in disciplinary actions against supreme court justices and district judges, the reviewing panel here makes no recommendation as to disposition. We must make that determination based on our own independent review of these facts and the record before us in this matter.

Initially, we agree with the panel's Conclusions of Law numbered 6, 7 and 8. The record does not disclose clear and convincing evidence of wilful misconduct in office, wilful and persistent failure to perform his duties or habitual intemperance. With respect to the panel's conclusion that respondent was guilty of conduct prejudicial to the administration of justice or that brings the judicial office in disrepute, we view Findings 4, 8, 9, 10, and 11 as significant and will discuss these in some detail.

Finding 4 relates to an incident where the respondent was acting in his capacity as a private attorney and structures a problem that has given us the gravest possible concern. According to the testimony of an investigating sheriff's officer, respondent told the officer he was a judge and that the officer should pick up a person who allegedly had stolen property from respondent's client. Respondent testified at the hearing that he merely told the officer to investigate the matter from a criminal point of view. Clearly, a justice of the peace may engage in the practice of law. § 5–99.6, W.S.1957, 1975 Cum.Supp. Canon 2B of the Code of Judicial Conduct adopted in 1973 by this court, states:

"A judge . . . should not lend the prestige of his office to advance the private interests of others; . . ."

This is merely a specific delineation of conduct prohibited by Canon 2: "A Judge Should Avoid Impropriety and the Appearance of Impropriety in *All* His Activities." [Emphasis supplied] Although the record is not entirely clear on this matter, an objective observer of respondent's behavior in this situation may have viewed it as an attempt to use the judicial office for his client's benefit. A justice of the peace, by virtue of the dual capacities of judge and private practitioner, which he often partakes, must be extremely diligent in avoiding even the appearance of impropriety in this respect. The prestige of the office of justice of the peace must never be used for the gain of private interests. Because a careful reading of the record lends itself to shades and innuendos which could impart to the judge's remarks various meanings and intentions, we are not, therefore, convinced beyond a reasonable certainty that respondent's conduct in this situation would warrant his removal.

Findings 8, 9 and 10 relate to two separate incidents occurring at an eating establishment in Casper. Both incidents were characterized by rude and insolent behavior on the part of respondent. The commentary to Canon 2, supra, clearly states the appropriate view of such behavior:

"Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of improprie-

---

**9.** The "clear and convincing" test is the test which appears in § 5.17 of the Proposed Standard Relating to Judicial Discipline and Disability, recommended by the A.B.A. committee on the same subject. It was said in *Matter of Heuermann*, S.D., 240 N.W.2d 603, 605–606, where the conduct of a judge was in issue:

"The first issue we consider is appropriate standard of proof in proceedings under the Act. We note that it would be inapposite to require proof 'beyond a reasonable doubt' as this is not a criminal prosecution. Proof by a mere preponderance of the evidence is also inapposite because of the severity of the sanction' which can be imposed. We conclude that the proper standard of proof is by

'clear and convincing evidence.' Such a standard provides adequate protection for the party subject to charges, but at the same time does not demand so much evidence that the ability of the Commission and this court to effectively oversee the judiciary is impaired. We note that this standard has been adopted in Alaska and California, upon whose statutes our own is based. See *In Re Hanson*, 1975, Alaska, 532 P.2d 303; *Geiler v. Commission on Judicial Qualifications*, 1973, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1. See also, *In Re Haggerty*, 1970, 257 La. 1, 241 So.2d 469, 479; *In Re Diener*, 1973, 268 Md. 659, 304 A.2d 587; *In Re Rome*, 1975, 218 Kan. 198, 542 P.2d 676."

ty. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

Respondent failed to meet these standards in these two situations. His conduct was improper and reprehensible, and certainly was justification for finding that he brought his judicial office into some degree of disrepute. Such behavior by a judicial officer cannot be sanctioned.

Finding 11 relates to an incident where respondent became involved in a physical altercation outside a private club. Again, respondent's behavior was improper—even under the circumstances—and cannot be condoned. The office of justice of the peace cannot be the subject of public confidence when the officeholder acts in such an unpeaceful manner—especially when there were alternative courses of conduct available.

We do not discount the other findings made by the panel, but view them as cumulative indices of respondent's behavior. When combined with the specifically-mentioned findings, we are confronted with deportment on the part of respondent which falls far short of the standards by which judicial officers must conduct themselves in this state. However, while respondent's behavior lends itself dangerously to a course of conduct which would result in his removal, we cannot say there are grounds for removal beyond a reasonable certainty.

Notwithstanding those things disclosed by the record which concern respondent's conduct, it would be less than fair to fail to take note of the fact that there were numerous witnesses who were highly complimentary concerning his ability and integrity on the Bench. Typical are the following:

Attorney Laird said that while he did not always agree with his [respondent's] decisions

"they have been based on the law as he sees it,"

and concluded that he has no reason to doubt his integrity in court.

Attorney Yapp testified:

"I would say he [respondent] is a highly capable Justice of the Peace and has been at all times since he was in that office."

Attorney Thomas J. Fagan testified that respondent

"is highly competent and one of the best Justices of the Peace in the State of Wyoming."

District Judge Forrister, on cross-examination, testified:

"Q. O. K. Could we start then with an opinion regarding very simply the qualtity [sic] of his decisions, sir, his legal ability, his rulings.

"A. Oh, I think rather good."

Judge Forrister was then asked:

"Q. Would you have any reason, as a District Judge in Natrona County, to doubt the judicial integrity of Mr. Johnson in his bias or prejudice toward individuals?

And he answered:

"A. . . . I know of no reason. Again, I have heard things about this that are strictly hearsay. I have no direct knowledge or any way of basing an impression of that, that would be anything unfavorable."

Rule 5, W.Adm.R.J.C., does not expressly provide for imposition of censure, as opposed to the removal of a justice of the peace. We are directed, however, to "make such disposition as is deemed proper with regard to removal or retention." In addition, § 5–99.8, supra, vests in this court the powers to discipline, which powers shall include the power to remove. The greater power to remove from office includes the lesser power to censure. *In re DuPont*, 322 So.2d 180, 183 (La.1975). In order to make the legislative grant of disciplinary powers meaningful, the full range of such powers must be contemplated. This conclusion is fully consistent with the mandate of the people which is reflected in Article 5, § 6, supra. We cannot believe that we are to treat justices of the peace differently, with respect to discipline, from supreme court

justices. Standards of conduct for these officers do not vary, and neither should the sanctions for a violation of such standards.

 Therefore, while we do not find sufficiently-clear and convincing evidence to warrant removal of the respondent, we find his personal behavior unbecoming to a judge in several respects. Accordingly, we do hereby formally censure Justice of the Peace Earl R. Johnson, Jr. His conduct was disparaging and inconsistent with the trust placed in him by the electorate. Through counsel, Justice of the Peace Johnson evidenced his recognition of these facts by expressing his contrition and stating unequivocally that there would be no further similar occurrences. We regard that commitment as one made to his electorate, and our disposition of this matter assumes that commitment will be honored.

It is fitting, then, to speak in plain English of the atmosphere of weighty concern with which we reach this decision. We live now in times when, because of our recent national experience, lawyers and judges are themselves on public trial. Justice cannot come easily and truly to the American society—and, indeed, to the world—unless there is confidence in the integrity of the American legal profession, and particularly in its judges. When he accepts his robes and as he lives the judicial life—lonely and heavy with unrewarded responsibility as it may be—the judge must commit his entire being not only to judicial integrity, but he must also conduct himself in all manner of things so that his very life-style will infuse the members of the public who observe his activities, on and off the Bench, with a sense of quiet moral confidence and security.

This court will be vigilant and will keep a watchful eye over the conduct of the legal profession in this state, to the end that all who are officers of our various courts will be charged with serving them as a credit in the eyes of all with whom they come in contact.

Justice Johnson is censured and publicly reprimanded, but we will not remove him from office.

RAPER, Justice, specially concurring.

I concur with what has been said in the court's opinion and its result. I would suggest that it was marginal between censure and removal, but I am willing to give the benefit of any doubt to Judge Johnson with the hope that these proceedings may have some salutary effect and he will desist from his unjudicial conduct in all categories.

The court of a justice of the peace is important because it is one in which probably the greater number of persons in a community receive exposure to the judicial system. Some must certainly be left with the impression that unacceptable extrajudicial conduct is a reflection of the quality of justice to be found in the court of such a judge. Public confidence is thus eroded.

It alarms me that Judge Johnson should even attempt to justify his gross conduct, language and treatment of persons at the Country Kitchen or his assault and battery upon Martin Sanchez, shown as part of findings "8," "9," "10" and "11," note 1, of the court's opinion, which comportment is inexcusable and a state of intoxication amplifies the seriousness. There is created an unfavorable image of judicial dignity and welfare of others, which must have a tendency to mirror itself unto the entire judiciary, degrading and demeaning an establishment which can tolerate only the highest of standards within itself.

I am hopeful that the public, the bar and Judge Johnson will consider the impact of censure and reprimand, the grave sort of punishment it is. It becomes a blot upon a record which Judge Johnson must now live down under watchful eyes and is of no small moment.