In the Matter of Disciplinary Action against C. James CIEMINSKI, Judge of the Barnes County Court with Increased Jurisdiction.

JUDICIAL QUALIFICATIONS COMMISSION, Respondent,

v.

C. James CIEMINSKI, Petitioner.

Civ. No. 9477.

Supreme Court of North Dakota.

Aug. 14, 1978.

Rehearing Denied Sept. 20, 1978.

Gregory D. Morris, Bismarck, for respondent.

William D. Yuill, Fargo, for petitioner.

SAND, Justice.

This is a disciplinary proceeding against the Honorable C. James Cieminski, Judge of the County Court with Increased Jurisdiction of Barnes County, pursuant to Rule 25 of the Judicial Qualifications Commission, based upon Section 27–23–03(3), North Dakota Century Code, and Section 96 of Article IV, as amended, of the North Dakota Constitution.[1] Complaints were filed with the Judicial Qualifications Commission [hereinafter JQC or Commission] which, after an investigation, instituted formal proceedings against Judge Cieminski.

The Commission, on 27 October 1977, served the Judge with notice which specified the charges against him and also advised that he could file written answers to the charges within fifteen days.

Judge C. James Cieminski filed an answer pursuant to Rule 9, JQC, denying the allegations of the formal complaint filed on 27 October 1977. He also moved that the JQC dismiss the complaint or in the alternative appoint an independent investigator to more fully explore the matter due to the alleged bias, prejudice, and conflict of interest exhibited by the staff attorney for the JQC. This motion was denied. The charges were amended 10 December 1977.

The JQC held a hearing, received testimony of witnesses, and made its findings of fact, conclusions of law, and recommendations. Judge C. James Cieminski petitioned the Supreme Court to modify or reject the recommendations of the JQC on the grounds that the conclusions of the Commission were not warranted by the findings of fact; that the testimony of witnesses does not support the findings of fact; and that the recommendations of the Commission are excessive and should be modified or rejected.

A summary of the pertinent findings of fact of the JQC are set out herein, followed by its conclusions of law, in parenthesis, specifying the Canons of the Code of Judicial Conduct allegedly violated by the Judge.

The Commission, in paragraph XI, found that the Judge willfully caused and allowed an unreasonable delay in the arraignment of Julie Ann Goeller and Debra Elaine Anderson on a class A misdemeanor, possession of a controlled substance, by failing to bring them before himself as the magistrate and judge of the Barnes County Court with Increased Jurisdiction (constituting willful violation of Canons 1, 2(A), 3(A)(1),

1. Rule 25. *Decision by Supreme Court.*
    "The Supreme Court shall review the record of the proceedings on the law and the facts and shall file a written opinion and judgment directing censure, removal, retirement, suspension, other disciplinary action or dismissal of the complaint as it finds just and proper, or the court may accept, reject or modify, in whole or in part, the recommendations of the Commission."
   Section 27–23–03(3), NDCC:
    "On recommendation of the commission, the supreme court may (a) retire a judge for disability that seriously interferes with the performance of his duties and is, or is likely to become, permanent; and (b) censure or remove a judge for action that constitutes willful misconduct in office, willful failure to perform his duties as prescribed by law or by administrative rule or regulation of the supreme court, willful violation of provisions of the code of judicial conduct as adopted by the supreme court, or habitual intemperance. No proceedings hereunder shall be instituted for alleged acts occurring more than six years prior to receiving a complaint."
   Section 96, Article IV, Constitution of North Dakota:
    "The legislative assembly may provide for the retirement, discipline, and removal of judges. The removal procedure provided for herein may be used in addition to the impeachment proceedings provided for in sections 194, 195, and 196 and removal provided for in section 197."

and 3(A)(5) of the Code of Judicial Conduct.[2])

In paragraph XIII it found that the Judge made the statement that Julie Ann Goeller was living at a house with four felons, which was inaccurate and misleading (constituting willful misconduct in office and willful violation of Canons 1 and 2(A), CJC [2]).

In paragraph XIV it found that the Judge failed to comply with the North Dakota Rules of Criminal Procedure in the arraignment of Julie Ann Goeller and Debra Anderson by not having a verbatim report of the proceedings kept either by a court reporter or by a mechanical recording of the proceedings (constituting willful failure to perform duties as prescribed by Rules 1 and 11(f), NDRCrimP,[3] and willful violation of Canons 1, 2(A) and 3(A)(1), CJC [2]).

In paragraph XV it found that the Judge willfully gave the appearance of and entered into and did bargain five days of the criminal contempt sentence of Julie Ann Goeller and Debra Anderson in exchange for the non-filing of an appeal regarding the contempt charge earlier (constituting willful failure to perform duties as provided in Rule 56, NDRCrimP,[4] and willful violation of Canons 1, 2(A) and 3(A)(1), CJC [2]).

In paragraph XVI it found that the Judge read mail belonging to an inmate of Barnes County jail without being aware of what it was at the time it was handed to him to read (constituting misconduct in office in violation of Canons 1 and 2(A), CJC [2]).

In paragraph XIX it found that the "Judge did on five occasions display to eight individuals a badge or credentials issued to him as an Air Force reservist" and the "apparent purpose in doing so was to impress the viewers with the fact that he held such an assignment, that the effect of his doing so was to create in the minds of the viewers that he was involved in investigations for the purpose of prosecution, while at the same time sitting as a judge in similar cases" (constituting willful misconduct in office in violation of Canons 1, 2(A) [2] and 5(A), CJC [5]).

In paragraph XX it found that the Judge in the course of his years as judge handled personal checking accounts on behalf of persons of the community who were having

2. Canon 1:
   "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."
   Canon 2(A):
   "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."
   Canon 3(A)(1):
   "A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism."
   Canon 3(A)(5):
   "A judge should dispose promptly of the business of the court."

3. Rule 1, NDRCrimP:
   "Except as otherwise provided by statute and in Rule 54, these Rules govern the practice and procedure in all criminal proceedings in the district courts and, so far as applicable, in all other courts, including prosecutions for violations of municipal ordinances."
   Rule 11(f), NDRCrimP:
   "*Record of Proceedings.* A verbatim record of the proceedings at which the defendant enters a plea shall be made and, if there is a plea of guilty, the record shall include, without limitation, the court's advice to the defendant, the inquiry into the voluntariness of the plea including any plea agreement, and the inquiry into the accuracy of a guilty plea."

4. Rule 56, NDRCrimP:
   "The courts governed by these Rules shall be deemed always open for the purpose of filing any proper paper, of issuing and returning process, and of making motions and orders."

5. Canon 5(A):
   "*Avocational Activities.* A judge may write, lecture, teach, and speak on non-legal subjects, and engage in the arts, sports, and other social and recreational activities, if such avocational activities do not detract from the dignity of his office or interfere with the performance of his judicial duties."

difficulty managing their own finances, which placed the Judge in a fiduciary relationship with these individuals in a position detrimental to the performance of his judicial duties (constituting a violation of Canons 5(A)[5] and 5(D), CJC[6]).

In paragraph XXI it found that the Judge was handling checking accounts on behalf of Mr. Byron Kreie, who, at the same time, had been named in a suit for the collection of the debts in the Barnes County small claims court over which the Judge presides (constituting willful violation of Canons 5(A)[5] and 5(D), CJC[6]).

In paragraph XXII it found that the voluntary action of the Judge in taking on these fiduciary duties regarding Mr. Kreie has created a conflict and has interfered with his performance of his official duties as judge of the Barnes County small claims court (constituting willful violation of Canons 5(A)[5] and 5(D), CJC[6]).

The Judicial Qualifications Commission recommended that the Judge be suspended from office without salary for a period of not less than 90 days and, as a condition of reinstatement, that he first make a significant study of judicial conduct and judicial ethics or such other appropriate study as the Supreme Court may deem necessary.

The Commission on Judicial Qualifications was created pursuant to Chapter 283 of the 1975 Session Laws, now codified as §§ 27–23–01 through 27–23–12, North Dakota Century Code.

The Rules of the Judicial Qualification Commission were adopted by the Supreme Court pursuant to § 96 of Article IV, North Dakota Constitution, as amended, and § 27–23–03, NDCC.

The Code of Judicial Conduct was adopted by the Supreme Court effective 1 January 1977.

This matter is before the Court for review pursuant to Rules 24[7] and 25, JQC.[1]

■ First we must determine the scope of review in this Court. While the JQC has many attributes which liken it to an administrative agency, nevertheless there is a substantial difference. An administrative agency generally has the power and duty to decide the issue before it, whereas the JQC only recommends to the Court. In determining the scope of review, consideration must be given to the particular responsibility and function of the reviewing authority over the basic subject matter, as well as the function and authority of the body whose action is reviewed. The JQC is required to make the investigation, conduct the hear-

---

**6.** Canon 5(D):

"Fiduciary Activities. A judge should not serve as the executor, administrator, trustee, guardian, or other fiduciary, except for the estate, trust, or person of a member of his family, and then only if such service will not interfere with the proper performance of his judicial duties. 'Member of his family' includes a spouse, child, grandchild, parent, grandparent, or other relative or person with whom the judge maintains a close familial relationship. As a family fiduciary a judge is subject to the following restrictions:

(1) He should not serve if it is likely that as a fiduciary he will be engaged in proceedings that would ordinarily come before him, or if the estate, trust, or ward becomes involved in adversary proceedings in the court on which he serves or one under its appellate jurisdiction."

**7.** Rule 24:

"(a) A petition to the Supreme Court to modify or reject the recommendation of the Commission for censure, removal, retirement, suspension, or other disciplinary action against a judge may be filed within 30 days after the filing with the Clerk of the Supreme Court of a certified copy of the recommendation complained of. The petition shall be verified, be based on the record, specify the grounds relied on, and be accompanied by the judge's brief and proof of service on the secretary of the Commission. At least 20 days before the return day the Commission shall serve upon the judge and file with the Clerk of the Supreme Court a responsive brief. Within 15 days after service of the Commission's brief the judge may file with the Clerk of the Supreme Court a reply brief which shall be served on the secretary of the Commission.

"(b) Upon failure to file a petition for review within the time provided, the Supreme Court shall consider the recommendation upon the record filed by the Commission and upon such further briefs or arguments the court may require.

"(c) The number, form and contents of briefs shall be in conformity with Rules 28 and 31, N.D.R.App.P."

ing, and makes it findings and recommendations, but the duty, authority, burden and responsibility of determining and making the actual judgment, together with the imposition of whatever penalty may be appropriate or necessary, rests with the Supreme Court. With this responsibility and power comes the concomitant obligation to conduct an independent inquiry into the evidence to determine whether or not the evidence merits the imposition of any penalty as recommended by the JQC or otherwise.

Accordingly our review, as established by case law, is de novo on the record. *In the Matter of Heuermann,* 240 N.W.2d 603 (S.D.1976); *In re Hanson,* 532 P.2d 303, 308 (Alaska 1975); *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973); and *In re Diener,* 268 Md. 659, 304 A.2d 587 (1973).

We next consider the standard of proof which applies to disciplinary proceedings, such as we have under consideration here. Disciplinary proceedings are neither civil nor criminal. Their aim is to maintain the honor and dignity of the judiciary and the proper administration of justice. The very nature and function of the judiciary can make it the target of dissidents. Case law has established that the proper standard of proof is by "clear and convincing evidence." *In the Matter of Heuermann, supra; In re Inquiry Relating to Rome,* 218 Kan. 198, 542 P.2d 676 (1975); *In re Hanson, supra; Geiler v. Commission on Judicial Qualifications, supra; In re Haggerty,* 257 La. 1, 241 So.2d 469, 479 (1970); *In re Diener, supra.*

The Commission in its findings separately stated that it was sensitive to what appeared to be an organized, orchestrated, vindictive campaign by one or more of the complaining parties. This, in itself, does not give us cause to more carefully scrutinize the evidence. We are concerned more with the relationship the witnesses may have, or had, with the complaining parties and, specifically, the interest and possible

bias the witnesses may have had, because these items may be reflected in their testimony.

The findings of fact, conclusions and recommendations of the Commission were signed by the chairperson and staff attorney for the Commission. The document itself does not indicate whether the Commission's action was unanimous or if there were some dissents. If we are to give weight to the Commission's findings of fact as contended by its staff attorney, then the action of the Commission should be signed by each member or, in the alternative, a statement should be made that the action was unanimous, or the number for and the number against, as the case may be. This should be stated on the document itself. We nevertheless give due weight [8] to the Commission's findings of fact, especially where the demeanor of the witness is a factor.

The signature of the staff attorney is not necessary and should not appear on the findings of fact, conclusions and recommendations of the Commission. If the staff attorney's signature appears on the final action of the Commission, there is a danger of creating a suspicion that the staff attorney unduly influenced the Commission and may have had a direct voice in making the findings of fact. We would find no fault, however, if the Commission were to direct the staff attorney to prepare the formal findings of fact pursuant to specific instructions of the Commission. The role of the staff attorney is that of an advocate for the truth in the investigation and at the hearing. The staff attorney is not the attorney or advocate for the complainants.

Our review of the transcript indicated that the Rules of Evidence, in some instances, were applied more technically than the situation required. This leads us to observe that the Rules of Evidence in a proceeding before the Commission need not

---

**8.** The term "due weight" as found in the Civil Service Law and as applied to the Municipal Civil Service Commission has been construed by the New York Supreme Court in *Bates v. Lang,* 26 A.D.2d 462, 275 N.Y.S.2d 578 (1966), to mean "feasible or warranted."

be applied strictly or technically. Generally, the procedures and rules applicable to a bench trial should be employed by the Commission. It should admit all relevant evidence which has probative value and is not prejudicial. Unlike a jury, the Commission does not receive instructions but has judge members deliberating with it who may advise on the competency, relevancy and admissibility of the evidence. In addition, this Court reviews the evidence on a de novo basis and should be able to determine which evidence may be considered. On review, this Court may reject improper evidence, but evidence which was not admitted cannot be considered unless the case were remanded for additional evidence. See *Beck v. Lind,* 235 N.W.2d 239 (N.D.1975), and *Schuh v. Allery,* 210 N.W.2d 96, 99 (N.D. 1973).

■ A reference in the brief was made to the meaning that should be given to the term "willfully" as used by the Commission in its findings of fact, and the suggestion was made that guidance could be obtained from the legislative definition of the term as found in § 12.1–02–02(1)(e), NDCC. In *City of Dickinson v. Mueller,* 261 N.W.2d 787 (N.D.1977), we said that the term "willfully" as defined in § 12.1–02–02(1)(e), NDCC, applied only to offenses or crimes described in Title 12.1, NDCC, and does not apply to § 5–02–06, NDCC, prohibiting the sale of alcoholic beverages to persons under twenty-one. Legal logic compels the conclusion that the term "willfully," as defined in § 12.1–02–02(1)(e), NDCC, does not apply to the Canons of the Code of Judicial Conduct. In *Mueller, supra,* at 790, we said:

"We are not saying that willfulness, the state of mind involved in the doing of an act willfully as opposed to an act done under coercion, may not under some circumstances be material."

■ We conclude that the term "willfully," when used in disciplinary proceedings involving actions contrary to the Canons of the Code of Judicial Conduct, should be construed to mean that the acts were the performer's free will and were not done under coercion.

■ As to standards of conduct we have, on several occasions, stated that lawyers, being officers of the court, hold a position of public trust and are held to a higher standard than laymen. *Disciplinary Board v. Jaynes,* 267 N.W.2d 782 (N.D. 1978); *Matter of Fosaaen,* 234 N.W.2d 867 (N.D.1975); and *In re Anderson,* 195 N.W.2d 345 (N.D.1972). It necessarily follows that judges must be and are held to higher standards than laymen. Judges hold a unique position of administering justice. They symbolize the law and justice and, consequently, their action and behavior will reflect favorably or unfavorably on the integrity of the judiciary and the high respect required in the administration of justice. The following comment attributed to a former judge, who heard it from his predecessor, is appropriate here.

"It is not merely sufficient to do justice but the public and society must have good cause and reason to believe that justice, in fact, is being done."

Whatever the source of this statement, it has merit. We are also convinced that the Canons of the Code of Judicial Conduct were designed and adopted to accomplish this, as well as to require that the judge not only act impartially but also that the litigants and society believe that the judge did, in fact, act impartially. Any action or behavior of a judge which will destroy the public confidence in the integrity and impartiality of the judiciary will tend to cause disrespect for the law itself.

Keeping the foregoing principles in mind in performing our duties and responsibilities on review, we now determine whether the evidence upon our independent de novo examination and evaluation, and by giving due weight to the Commission's findings of fact, clearly and convincingly proves that the Judge in question engaged in conduct meriting an imposition of a penalty in any form or degree, or whether the complaint and proceedings should be dismissed.

We now examine the pertinent findings of fact made by the Commission.

After reviewing and evaluating the evidence pertaining to finding of fact number XI (failure to arraign without delay) and the corresponding conclusion of law, we are left with the impression that the complainants and the Commission erroneously considered an arraignment under Rule 10, North Dakota Rules of Criminal Procedure, the equivalent of an initial appearance under Rule 5, NDRCrimP, and its reference to release from custody (bail) as provided for in Rule 46, NDRCrimP.

Under Rule 5, NDRCrimP, the duty to bring the arrested person before the magistrate for an initial appearance is placed squarely upon the person making the arrest by the following language in 5(a):

"An officer or other person making an arrest shall take the arrested person without unnecessary delay before the nearest available magistrate."

We are not aware of any statute or rule which imposes an affirmative obligation upon a judge of a county court with increased jurisdiction to bring a defendant before him for arraignment, as distinguished from an initial appearance, nor is there a specific statute or rule directing that a prompt arraignment be held. Nonetheless, we do not encourage delay. Custom and practice may have established that the judge, as the dispenser of justice, may not stand idly by and permit the rights of the defendant to be disregarded, and has an affirmative obligation to be available at reasonable times for initial appearances. In any event the defendant is entitled to a speedy trial.

In this instance the offense was a misdemeanor and it is possible that the initial appearance could also be converted into an arraignment if the defendant is properly advised. Some problem may arise, however, where the defendant desires legal counsel and wishes to consult with counsel before pleading to the charge. Under such circumstances, a combined initial appearance and arraignment would not be proper. In this respect, the rules and statutes may not be adequate to fully advise the judge of his responsibility. Nevertheless, we cannot, as a matter of law, conclude that finding of fact number XI is supported by clear and convincing evidence. Having reached this conclusion we must still consider whether the Judge, in making a certain statement, acted improperly or in contravention of the Canons of Judicial Conduct. The Judge's statement [9] in open court that two persons will not be arraigned because they are not taking the matter seriously enough was established by at least two witnesses. The Judge, on cross-examination, testified that he did not recall having made such reference to the individuals being in jail. The question directed to the Judge on cross-examination did not identify the two individuals. But, be that as it may, the Judge admitted, during cross-examination, that he did not recall making such a statement but it was possible that he did. Clear and convincing evidence establishes that the Judge made a statement in substantially the form as stated earlier. The statement itself could have a chilling effect on the arresting officer and could have prevented him from pursuing or arranging for an earlier initial appearance or arraignment. We conclude that the Judge, in making the statement that two misdemeanants will not be arraigned today because they do not take the matter seriously, acted in contravention of Canons 1 and 2A.

With reference to finding of fact number XIII, the testimony disclosed that the Judge stated: "That he had knowledge that Julie Goeller was living at Henry Howe's house and that a felon was also there." The Judge admitted making a statement regarding Julie Goeller going to Henry Howe's house but denied making the statement that she lived in Howe's house with four felons. We are more concerned with the question of whether the Judge made a statement substantially as alleged than we are with the precise language of the statement or the truthfulness of the statement. Clear and convincing evidence establishes

---

**9.** The statement was made during arraignment of other defendants arrested in the same raid in which the defendants, Goeller and Anderson, were arrested.

that the Judge made a statement which could have been construed to mean that Goeller was living in Howe's house in which a felon also lived. The Judge's behavior in volunteering such statement to the attorney for the defendant without just cause is incompatible with Canons 1 and 2A and does not promote public confidence in the integrity and impartiality of the judiciary.

The finding of fact number XIV that a verbatim record was not kept of the combined initial appearance and arraignment of Julie Goeller and Debra Anderson is supported by clear and convincing evidence. Rule 11(f), NDRCrimP, provides that "a verbatim record of the proceedings at which the defendant enters a plea shall be made and, if there is a plea of guilty, the record shall include, without limitation, the court's advice to the defendant, the inquiry into the voluntariness of the plea, including any plea agreement, and the inquiry into the accuracy of a guilty plea." There is no question that Rule 11(f) applies to a county court with increased jurisdiction. See Rule 1, NDRCrimP. However, as stated earlier herein, there appears to be some confusion as to whether this was an initial appearance or an arraignment, or a combination of both. Rule 11(f), NDRCrimP, does not refer to an initial appearance. However, if the defendant is required to enter a plea even though the proceedings may have been initiated as an initial appearance, Rule 11(f) would apply in any event. The fact that the arraignment was not completed does not alter this requirement.

The evidence established that Judge Cieminski's court did not have a regular court reporter available on a full-time basis but shared the court reporter's services with the district court whenever the district court did not need the reporter's services. In this instance the reporter was not available. The court also had a tape recorder which it used generally whenever the court reporter's services were not available but, in this instance, the tape recorder assigned to the court did not function. Another tape recorder was obtained from another office but it also was inoperable. The Judge testified that he was faced with the proposition of either proceeding and taking personal notes or delaying the arraignment further, and he elected to proceed and take personal notes. There was also evidence that the period of time involved here was hectic. The record does not reflect that the Judge informed the defendants of the difficulty with which he was faced nor does the record reflect that the defendants waived the requirements of Rule 11(f). We add, however, that the arraignment, if it was an arraignment, was not completed. We also observe and note that these proceedings were before this Court in *State v. Goeller and Anderson,* 263 N.W.2d 135 (N.D.1978), where we upheld the contempt citation.

We can understand that the Judge was faced with a difficult situation but the inescapable fact is that the proceedings were indicative of being an arraignment and the Judge did not comply with Rule 11(f) [10] NDRCrimP, and, technically, his actions were not compatible with Canon 2A.

With reference to finding of fact number XV, the record does not contain clear and convincing evidence that the Judge gave the appearance of, entered into, and bargained five days of a criminal contempt sentence of Julie Ann Goeller and Debra Anderson in exchange for not filing an appeal of the contempt charge of 2 April 1977.

The evidence discloses that, initially, the Judge was contacted by telephone by Mr. Mackenzie, Sr., on behalf of Goeller and Anderson, on Saturday at about 6 p. m. at his home and, in response to a question, advised that an appeal would stay the sentence, and that he (the Judge) was returning to his office at about 7 or 7:30 p. m. and would remain there until about 9:30 p. m., and, in fact, he went to his office and remained there until some time between 9:30 and 10 p. m. However, no papers were filed with him that night. Mr. Mackenzie, Jr., on 4 April 1977, personally contacted the Judge and had three discussions on the topics of release, appeal and period of con-

**10.** See *State v. Decker,* 181 N.W.2d 746 (N.D. 1970).

finement relating to the contempt citation. After the first discussion with the Judge, Mackenzie told the defendants (Goeller and Anderson) that the Judge was thinking of releasing them on Wednesday but they expressed the belief that this was too long a period of time for their conduct which led to the contempt citation. Mackenzie, Jr., returned to the Judge and informed him of this. A general conversation regarding basketball ensued between him and the Judge. They also talked about the three days which the defendants said were too long. Mackenzie again returned to the defendants in jail and informed them that there was a probability that they could be released tomorrow or else he would file the notice of appeal. Mackenzie then returned to the Judge and informed him that the defendants stated they would rather get out on Tuesday, the 5th of April, than be there the remaining days.

Mackenzie testified that he asked the Judge if he would hear his motion to secure the release if he filed a motion and the Judge said that he couldn't because there was "no subjective law or basis for it." Mackenzie significantly testified, however, that these were informal meetings to try and find out what the situation was, more specifically on the reduction of the contempt sentence. Judge Cieminski testified that he had concern about the defendants missing school and that he had initially calculated to release them on Wednesday, but upon retracking to the point of arrest he realized that he would give credit to Friday (day of arrest) as part of a day and Tuesday morning as part of a day, and thus the five days would come out to Tuesday. He further testified that, on his own motion, he called the sheriff and said that they could be released on Tuesday morning at 7:30.

It may also be possible that Mackenzie thought he was negotiating an earlier release. While we do not think a judge should be criticized or sanctioned for discussing alternatives with an attorney regarding his client, we, however, believe it would have been more judicious if, after the first discussion or conversation with Mack-

enzie, the Judge would have stated what he intended to do and that he, the attorney, could decide what he thought should be done. The Judge should have taken steps to avoid even the appearance or impression that he might be entertaining negotiations for a reduction of the sentence.

The record also permits a conclusion that the Judge ineptly informed Mackenzie that if an appeal is filed the court loses jurisdiction until the appeal is settled.

■ Finding of fact number XVI stating that the Judge "read mail belonging to an inmate of the Barnes County Jail on April 2, 1977, without being aware of what it was at the time it was handed to him to read" is supported by clear and convincing evidence. However, the finding itself does not state facts which constitute a violation of any Canon. Neither does the record establish such facts. Therefore the conclusion of law that this finding constituted a violation of the Canons is erroneous. The evidence discloses that the Judge only read a portion of the letter handed to him and that, at the time it was handed to him, he was not advised that it was a letter from an inmate. He merely was invited to read what someone had said about him. Neither was it self-evident nor did the writing on the paper suggest that it was a letter. It could well have been considered by the Judge to be a note or memorandum because it was written on a yellow legal pad. We, at this point, note that counsel for the Commission, in oral argument on appeal, in effect admitted that the conclusion of law in regard to this finding of fact was not proper. We respect counsel for this.

As to finding of fact number XIX that the Judge, on different occasions, displayed to several individuals a badge or credentials issued to him, is supported by clear and convincing evidence. However, whether his apparent purpose in doing so was to impress the viewers with the fact that he held such an assignment and that he did this to create in the minds of the viewers that he was involved in investigations for the purpose of prosecution is not free from doubt. There

is no question that he did this while he was sitting as a judge. We, however, find it difficult to determine the purpose or motive or that it was to create certain impressions.

■ The showing of credentials or badges as a point of interest per se is not wrong. However, if the showing is under circumstances which can lead to a misunderstanding or leave an erroneous impression, then it is no longer proper. We conclude that the showing of the badge and credentials, under the circumstances here, could have detracted from the integrity and impartiality of the judiciary and, as such, the Judge's actions were not in harmony with Canons 1, 2A and 5A.

Finding of fact number XX that the Judge handled personal checking accounts of persons who experienced difficulties in managing their own finances, and finding of fact number XXI that the Judge handled the checking account of Byron Kreie, who has been named in a suit for collection of a debt in Barnes County small claims court over which the Judge presides, and finding of fact number XXII, that by taking on the foregoing fiduciary duties the Judge created a conflict which interfered with his performance of official duties as Judge of the Barnes County small claims court, are all supported by clear and convincing evidence. The actions of the Judge relating thereto were in contravention of Canons 5A and 5D.

The record discloses that this activity was the result of families being referred to him by his church and that he did this work gratuitously out of kindness. The Judge's actions, in this respect, may have been well-intended and commendable in some respects but, nevertheless, they were improper and contrary to the Canons mentioned earlier.

■ After a careful examination and analysis of the evidence, and after an evaluation of these findings of fact which are supported by clear and convincing evidence, we conclude that disciplinary action against the Honorable C. James Cieminski, Judge of the Barnes County Court With Increased Jurisdiction, is warranted.

We reach this conclusion even though we believe that the Judge may have had no intention of contravening the Canons of the Code of Judicial Conduct and that he may have been well-motivated in his actions and behavior. Nevertheless, we cannot disregard the total effect of such actions. We are satisfied that the Judge has performed admirably in many respects and that the actions complained of were not of an extended nature but were more in connection with the charges against the two defendants and interrelated events. Having arrived at this conclusion, we now examine the recommendations of the Commission to determine if they are appropriate in this instance.

A suspension from office without salary, as recommended by the Commission, out of necessity under our system will impose or cast a burden upon one or more of the surrounding judges of county courts with increased jurisdiction who were in no manner responsible for the disciplinary action. A suspension from office may also indirectly delay justice and, in some instances, create hardships to innocent parties. The fact that the county involved here may gain financially, indirectly, is not involved in our decision and is not a factor in our consideration. However, because a suspension without pay in reality imposes a burden upon other judges because they would be required to pick up the suspended judge's case load,[11] we are compelled not to accept or follow the recommendation of the Judicial Qualifications Commission.

The Commission had a difficult task and acted without the benefit of North Dakota case law appertaining to the Canons of Judicial Conduct and the Rules of Procedure for the Judicial Qualifications Commission. The proceedings of the Commission indicate a dedication to duty.

In performing our duty as imposed by the Constitution we must make every effort that we abide by the high standards of justice and that we not merely attempt to

11. A fine, because of this problem, would be more appropriate than a suspension.

appease the public or one or more of its segments. The judiciary, to accomplish its purpose and objective, must be respected and trusted.

We conclude that Judge C. James Cieminski should be and he is hereby censured for his conduct, behavior and actions as stated in those findings of fact which we concluded are supported by clear and convincing evidence, and for his acts discussed in the findings of fact, which acts were prejudicial to the administration of justice and may bring the judicial office in disrepute.

As part of this censure, it is ordered that C. James Cieminski, Judge of the Barnes County Court, certify to the Clerk of this Court within a period of 60 days from the service of this opinion upon him, that he has read and studied the Canons of the Code of Judicial Conduct and the North Dakota Rules of Criminal Procedure.

It is further ordered that Judge C. James Cieminski pay for the costs incurred by the Commission (excluding salary of staff) in investigating and conducting the hearing on this matter. The amount of the cost, which we believe will be substantial, is to be determined by the Commission or its designated agent or officer. It is further ordered that he submit evidence of payment to the Clerk of this Court within 30 days from the date of billing or, in the alternative, evidence that satisfactory arrangements for payment have been made with the Commission. Failure to comply with the foregoing provisions shall constitute grounds for additional disciplinary action, including a fine or other appropriate penalties.

ERICKSTAD, C. J., PEDERSON and VOGEL, JJ., and GRAFF, District Judge, concur.

GRAFF, District Judge, sitting in place of PAULSON, J., disqualified.

## ON REHEARING

SAND, Justice.

In his petition for rehearing, Judge Cieminski contended this court was without authority to assess costs pursuant to his interpretation of § 27–23–11, North Dakota Century Code, which provides as follows:

"No award of costs shall be made in any proceeding before the commission, a master, or the supreme court."

He also contended that costs could not be taxed or awarded under common law and that such action was permissible only to the extent permitted by statute and that in this case there is no statute authorizing the assessment of costs. We recognize a distinction between awarding costs and assessing costs.

Judge Cieminski's argument is obviously predicated on his erroneous interpretation of § 27–23–11, NDCC and on his failure to recognize the difference between awarding costs to complainants or the party complained against as distinguished from assessing costs as part of the disciplinary action, especially where the funds collected pursuant to the assessment inure to the benefit of the State (§ 186 North Dakota Constitution) and not to a party or parties in the proceedings, which is generally the case in civil proceedings. As noted in the basic opinion, these proceedings are neither civil nor criminal but are of a quasi administrative-judicial nature.

A brief look at the pertinent sections of the Code and interrelated Rules will be helpful in developing a better understanding of our resolution of the principal issue.

Section 1–02–01, NDCC, states that the Code establishes the law in this state and directs that the law "and its provisions and all proceedings under it are to be construed liberally, with a view to effecting its objects and to promoting justice."

Section 27–23–02, NDCC, in part, and as is pertinent to the issue involved here, provides as follows:

"The commission has the power to investigate complaints against any judge in the state and to conduct hearings concerning the discipline, removal, or retirement of any judge."

Section 27–23–03(3), NDCC, provides as follows:

"On recommendation of the commission, the supreme court may (a) retire a judge for disability that seriously interferes with the performance of his duties and is, or is likely to become, permanent; and (b) censure or remove a judge for action that constitutes willful misconduct in office, willful failure to perform his duties as prescribed by law or by administrative rule or regulation of the supreme court, willful violation of provisions of the code of judicial conduct as adopted by the supreme court, or habitual intemperance. No proceedings hereunder shall be instituted for alleged acts occurring more than six years prior to receiving a complaint."

Section 27–23–03(5), NDCC, provides as follows:

"The supreme court shall make rules implementing this chapter and providing for confidentiality of proceedings."

Rule 25 of the Rules of Judicial Qualifications Commission, provides as follows:

"The Supreme Court shall review the record of the proceedings on the law and the facts and shall file a written opinion and judgment directing censure, removal, retirement, suspension, other disciplinary action or dismissal of the complaint as it finds just and proper, or the court may accept, reject or modify, in whole or in part, the recommendations of the Commission."

Rule 39(a) and (f), North Dakota Rules of Appellate Procedure, read as follows:

"(a) *To Whom Allowed.* Except as otherwise provided by law, if an appeal is dismissed, costs shall be taxed against the appellant unless otherwise agreed by the parties or ordered by the court; if a judgment is affirmed, costs shall be taxed against the appellant unless otherwise ordered; if a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered; and if a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the court."

"(f) *Costs Taxable in the Supreme Court.* In original proceedings before the court, costs as applicable in (e) above may be taxed by the clerk in favor of the party entitled to costs."

Rule 54(e), North Dakota Rules of Civil Procedure, in part, and as is pertinent to the issue involved here, reads as follows:

"Costs and disbursements shall be allowed as provided by statute . . . ."

We are not relying upon either Rule 39, NDRAppP, or Rule 54, NDRCivP, supra, for the assessment of costs.

Judge Cieminski's argument apparently is that the proscription in § 27–23–11, NDCC, against awarding costs should be given exceptionally broad application but the provisions of § 27–23–03(3), NDCC, should be given a very limited and narrow construction.

If Judge Cieminski's argument were valid and if the same rationale were applied to § 27–23–03(3), NDCC, as he applies to § 27–23–11, NDCC, the end result would be that the court could impose only a censure or a removal from office, and nothing else. We cannot agree with him nor do we accept his argument because we doubt the Legislature intended to limit the disciplinary action to only one or the other action with no in-between action whatsoever to accomplish the objectives and goals of the Act.

The Supreme Court of Kentucky in *Nicholson v. Judicial Retirement and Removal Commission,* 562 S.W.2d 306 (Ky.1978), had under consideration an almost identical issue. The contention was that the Kentucky Act expressly delineated only three courses of action: (1) retirement for disability, (2) suspension without pay, and (3) removal for cause. The court observed that the Kentucky Act was modeled after the New York Act and that the New York court had issued a public reprimand without removing or retiring or suspending the judge in the case of *In re Sobel and Leibowitz,* 8 N.Y. 2d(a) (Ct. on the Jud.1960). The Kentucky court specifically noted as follows:

"If the Commission can remove a judge from office, it can certainly impose lesser sanctions in order to achieve the ultimate goal of judicial purification. We hold

that the express grant of authority to retire, suspend or remove judges for good cause contained in Section 121 of the Kentucky Constitution includes by implication the authority to impose the lesser sanctions set forth in RAP 4.020(b)." *Nicholson v. Judicial Retirement and Removal Commission,* 562 S.W.2d 306, 310.

In the *Matter of Anderson,* 252 N.W.2d 592, the Minnesota Supreme Court, in 1977, had under consideration a statutory provision substantially similar to § 27–23–03(3), NDCC, in a disciplinary proceedings against a judge. The court imposed a suspension, but the judge involved contended that the court was not empowered by the statute to impose the suspension and that the court had authority only to censure or remove.

The court observed that a literal reading of the statute would support the judge's position. The court, however, stated that by keeping in mind the broad language of the constitutional authorization for this legislation and considering the objectives sought by the legislature for providing a plenary system of judicial discipline which is capable of dealing appropriately with all cases that might arise in any varied factual context, it felt that the grant of absolute power to remove from office implicitly gave it the power to impose lesser sanctions short of removal in the absence of specific indications to the contrary by the legislature.

We are not aware of any valid argument why the reasoning of the Kentucky and the Minnesota courts should not apply to our statutory provision. We are satisfied that the statutory provision providing censure or removal impliedly also includes any appropriate action in between. This concept is further supported by the adoption of Rule 25 of the Judicial Qualifications Commission, supra, which was adopted contemporaneously with the enactment of Chapter 27–23, NDCC, when the court was still acutely mindful of its intent, goals and objectives.

We are satisfied that § 27–23–03(3), NDCC, and Rule 25 of the Judicial Qualifications Commission give this court authority to impose a censure, assessment of costs, or any other action up to and including removal. Assessment of costs is more severe than a simple censure but considerably less severe than removal.

The assessment of costs for the investigation and hearing is not new in this state. It has been employed in disciplinary proceedings against attorneys, both before and after the adoption of Rule 21 of the Rules of Professional Discipline, which became effective 1 July 1977. Rule 21 specifically authorizes assessment against the attorney for expenses incurred in the disciplinary proceedings. The disciplinary action in the *Matter of Garcia,* 243 N.W.2d 383 (N.D. 1976), assessed costs and was prior to the adoption of Rule 21. The *Matter of Pohlman,* N.D., 248 N.W.2d 833, the *Matter of Walton,* N.D., 251 N.W.2d 762, and the *Matter of Jaynes,* N.D., 267 N.W.2d 782, each assessing costs, occurred after the adoption of Rule 21.

Chapter 3 of the 1977 Session Laws appropriates funds out of the general fund and from special funds derived from federal funds for the Judicial Qualifications Commission.

Section 27–23–11, NDCC, proscribes the awarding of costs. We, however, recognize there is a difference between awarding costs to complainants or the party complained against as distinguished from assessing costs as part of the disciplinary action. The funds collected pursuant to the assessment inure to the benefit of the state (§ 186 of the North Dakota Constitution) and not to a party or parties in the proceedings.

Disciplinary proceedings are neither civil nor criminal, consequently the rules pertaining to either do not necessarily apply. Specifically, Rule 54(e), NDRCivP, pertaining to costs and disbursements, does not apply for several reasons. Initially, Rule 54(e) is predicated on the common practice that the prevailing party is entitled to its costs and disbursements. As stated earlier, assessment of costs is a part of the disciplinary action and is not the same as awarding costs to either party as prohibited

by § 27–23–11, NDCC, or as contemplated by Rule 54(e), NDRCivP.

Rule 39, NDRAppP, allows costs in the supreme court. However, it was not employed for the assessment of costs against Judge Cieminski.

▄ The assessment of costs as a part of a disciplinary action is more than a censure, less than a suspension, but has a useful purpose and serves as a deterrent to conduct not in harmony with the Code of Judicial Conduct.

The assessment of costs is not unusual. The Kansas Supreme Court in *In re Inquiry Relating to Rome,* 218 Kan. 198, 542 P.2d 676 (1975), and *In re Miller,* 223 Kan. 130, 572 P.2d 896 (1977), as part of the disciplinary action taken, censured the judge and directed him to pay the costs of the proceedings. Similarly, costs were assessed in *Matter of Heuermann,* 240 N.W.2d 603 (S.D.1976).

In *In re Daniels,* 340 So.2d 301 (La.1976), the Louisiana Supreme Court censured a judge and assessed him with all witness and transcript costs incurred in the hearing. On rehearing the costs were fixed at (limited to) $1,000. The court, in reaching its conclusion, did not make reference to the supreme court rule which provides that the commission may tax costs subject to review by the court, but merely granted it without comment. In analyzing the opinion it becomes apparent that the court assessed costs as part of the disciplinary proceedings rather than under the rule allowing the taxing of costs, as that term is normally understood in civil proceedings.

In the *Matter of Terry,* 360 N.E.2d 1004 (Ind.1977), the supreme court ordered a suspension without pay against the judge and assessed costs against him.

In *In re Morrissey,* 313 N.E.2d 878 (Mass. 1974), the court deemed that a suspension from office or disbarment was too severe but censured the judge and ordered him to pay $5,000 as costs to the treasurer of the commonwealth.

In *In re Larkin,* 333 N.E.2d 199 (Mass. 1975), the court censured the judge and ordered him to pay $15,000 as costs in the proceedings to the treasurer of the county of Worcester within 90 days.

These cases clearly illustrate that the courts considered the assessment of costs as part of the disciplinary proceedings.

We are convinced § 27–23–03(3), NDCC, permits the assessment of costs as a part of the disciplinary action and that the proscription of awarding costs in § 27–23–11, NDCC, does not apply to the assessment of costs as part of the disciplinary action.

▄ We recognize that costs in some instances can be extremely high and may have a chilling effect upon a judge complained against to properly defend himself, and for that reason we believe the order should specify a certain amount or state that the amount is not to exceed a specific sum.

▄ We are satisfied that the authority to impose assessment of costs carries with it the authority to limit the amount of assessments. The court in its discretion may limit the costs depending upon the circumstances. In the basic opinion we merely assessed the costs and directed the judge to pay them without any further qualification. We are herewith limiting the costs assessed to a sum not exceeding $5,000.00.

The petition for rehearing, for the foregoing reasons, is denied.

ERICKSTAD, C. J., PEDERSON, J., and GRAFF, District Judge, concur.

Since VOGEL, J., resigned from the Court August 15, 1978, he did not participate in this decision.