No. 52,241

STATE OF KANSAS *ex rel.* COMMISSION ON JUDICIAL QUALIFICATIONS, *Petitioner,* v. RICHARD J. ROME, *Respondent.*

(623 P.2d 1307)

Opinion filed February 10, 1981.

*Edward G. Collister, Jr.,* Examiner, Commission on Judicial Qualifications, of Lawrence, argued the cause and was on the brief for the petitioner.

*Lane H. Cronhardt,* of Hutchinson, argued the cause, and *Donald L. Gottschalk,* also of Hutchinson, was on the brief for the respondent.

*Per Curiam:* This is an original proceeding in discipline against the Honorable Richard J. Rome, Associate District Judge of Reno County. This court has jurisdiction under Art. 3, § 15 of the Kansas Constitution.

The Commission on Judicial Qualifications found that respondent Judge Rome had violated Canons of the Code of Judicial Conduct in four of the five counts and recommended his removal from office. Judge Rome rejected the Commission's findings and recommendations and the matter is here for determination.

Respondent contends the Commission acted improperly in sixty particulars.

Respondent contends his constitutional rights were violated by the Commission's denial of his request for a jury trial. This same issue was raised by respondent in his earlier disciplinary proceeding and determined adversely to him in the opinion therein. *In re Rome,* 218 Kan. 198, Syl. ¶4, 542 P.2d 676 (1975). We adhere to that determination, based on the rationale expressed at page 204 of the opinion.

The bulk of respondent's claims of error relate to procedural matters and the admission and exclusion of evidence. We have carefully examined each point raised and have considered the same both individually and cumulatively. Further, we have thoroughly scrutinized the transcript and records of the entire proceeding. Nothing is to be gained from itemizing herein the various rulings and procedural matters asserted by respondent to

be erroneous. It is sufficient to state the same have been considered and found to be without merit. We conclude: (1) The Commission afforded respondent a fair and impartial hearing; (2) respondent received due process of law; and (3) the rights of respondent were not prejudiced by any procedures or rulings of the Commission.

For convenience, the particular Canons of the Code of Judicial Conduct which the Commission found had been violated by respondent are reproduced herein as follows:

"CANON 1

"*A Judge Should Uphold the Integrity and Independence of the Judiciary*

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective." 225 Kan. cxix.

"CANON 2

"*A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities*

"A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

"B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness." 225 Kan. cxix.

"CANON 3

"*A Judge Should Perform the Duties of His Office Impartially and Diligently*

"The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

"A. *Adjudicative Responsibilities.*

"(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

. . . .

"(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

. . . .

"(6) A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements

in the course of their official duties or from explaining for public information the procedures of the court." 225 Kan. cxx.

The participating members of the Commission were unanimous in their findings of fact, conclusions of law and recommendations, which are reproduced herein *in toto:*

"FINDINGS OF FACT, CONCLUSIONS
OF LAW AND RECOMMENDATIONS

"The foregoing cases were presented to the Commission in two separate evidentiary sessions. On November 5 and 6, 1979, evidence was produced on Counts I and II of the Amended Notice of Formal Proceeding before Commissioners Fred N. Six, Chairman; Charles S. Arthur; Ken Bronson; Georgia Neese Gray; Hon. Brooks Hinkle; and Hon. L. A. McNalley.

"As a result of the fact that potential additional violations of the Canons of Judicial Conduct surfaced during the presentation of such evidence on November 5 and 6, 1979, at the Reno County Courthouse, Hutchinson, Kansas, an Amended Notice of Formal Proceeding was filed pursuant to Rule 617 of the Rules of the Supreme Court Relating to Judicial Conduct. Subsequent thereto, Docket #197 was also filed and processed according to the Rules and consolidated with Docket #173 by Order of the Chairman following stipulation by the Examiner and counsel for Respondent that such should occur. On April 28 and 29, 1980, in the Kansas Judicial Center, Topeka, Kansas, pursuant to an Order of the Commission, evidence was presented on Counts III and IV of the Amended Notice of Formal Proceeding in Docket #173 and in Docket #197, before Fred N. Six, Chairman; Charles S. Arthur; Hon. Edward F. Arn; Ken Bronson; Hon. O. Q. Claflin III; Georgia Neese Gray; Hon. Harold R. Riggs; and Hon. Brooks Hinkle.

"L. A. McNalley, by virtue of the fact that he resigned effective December 14, 1979, did not participate in the decision in this matter. Hon. O. Q. Claflin III, having been appointed to the Commission on December 14, 1979, did not participate in the hearing or decision upon Counts I and II of the Amended Notice of Formal Proceeding in Docket #173.

"Subsequent to the evidentiary hearing set forth previously, the Commission makes the following Findings of Fact, Conclusions of Law and Recommendations concerning Docket #173 and #197.

"Count I, Docket #173

"(1) Myrtle Hatzenbuehler appeared with her attorney, Charles Hyter, July 31, 1978, for trial to the Court on a charge of driving while intoxicated. The case was heard by Respondent, Richard J. Rome, who found Ms. Hatzenbuehler guilty of DWI and sentenced her to confinement in the Reno County Jail for one (1) year. A request for parole was denied. Several other similar requests by Mr. Hyter were also denied.

"(2) On September 28, 1978, the Reno County Bar Association had a noon luncheon at the Royal Inn, Hutchinson, Kansas. During that meeting a motion was made by John Shaffer and seconded by Michael Chalfant to have the Bar Association as a group go on record in favor of retaining the non-partisan method of selection of judges. The non-partisan selection method was currently in effect in Reno County, but a proposition to return to election of judges was to be on the ballot of the November, 1978, election.

"(3) Respondent was present at the meeting, and presided as the Association's president. Respondent personally opposed non-partisan selection of judges. One reason for his opinion was that Respondent felt the voters should elect judges, but Respondent admitted he also was of that opinion because he personally would have no chance of being appointed to a district court position under the selection method of appointment. The District Court judge for Division One of the 27th Judicial District had been selected, and had been selected at a time when Respondent was an Associate District Court Judge.

"(4) In September of 1978, Mr. Kerry Granger, a member of the Reno County Bar, was retained to secure Ms. Hatzenbuehler's release from confinement. While the exact time and sequence of events was not related exactly alike by the witnesses, the corroborating features of the testimony of Mr. Granger, Mr. Hyter, and District Judge Porter Brown indicate that after the Bar Association meeting at noon on the 28th of September, 1979, which meeting Mr. Granger did not attend, Mr. Granger approached Respondent with an oral request for probation from confinement for Ms. Hatzenbuehler.

"(5) Mr. Granger testified that Respondent replied 'Hyter's vote sealed her fate.' When questioned by Mr. Granger as to what he meant, Respondent replied 'Hyter's vote sealed her fate' and 'Oh, you're all in it together.'

"(6) Mr. Granger testified that he called Mr. Hyter (and his testimony was corroborated by Mr. Hyter), reported the statement made by Respondent that 'Hyter's vote sealed her fate,' and inquired what they should do.

"(7) Mr. Hyter and Mr. Granger agreed that the two attorneys should consult Judge Porter Brown, the administrative judge, for advice as to future action.

"(8) The attorneys testified, and were corroborated by the testimony of Judge Brown, that they met on the next day, Friday, and the statement made by Respondent was related to Judge Brown.

"(9) Judge Brown suggested that they let Respondent cool off and visit with him about the matter. No further discussion was had by either attorney with Respondent.

"(10) Respondent denied making the statement to Mr. Granger, stating it was impossible that Respondent made such a statement.

"(11) The Commission, however, in view of the fact Mr. Granger had no way of knowing that Mr. Hyter attended the Bar Association meeting or how he voted, the fact that Respondent did, the fact that between Thursday noon and Friday afternoon (28th and 29th of September, 1978), Mr. Granger reported the statement both to Mr. Hyter and then to Judge Brown, a report that was both contemporaneous with the making of the statement and at least four months before any investigation by the Commission commenced, believes the testimony of Mr. Granger, Mr. Hyter and Judge Brown.

"(12) The Commission specifically finds that Respondent stated to Mr. Granger when asked for probation for Ms. Hatzenbuehler that 'Hyter's vote sealed her fate.'

"(13) The statement meant the request for probation was denied at the time because Charles Hyter had voted in favor of supporting the selective system of appointing judges.

"(14) Respondent on his own motion placed Ms. Hatzenbuehler on probation on October 13, 1978.

"(15) Ms. Hatzenbuehler went to Mr. Granger's office on October 14, 1978, and told Mr. Granger he didn't have anything to do with getting her out of jail, because she had been told that by Respondent.

"(16) It would therefore appear that on October 13 and 14, Respondent knew Mr. Granger had requested probation by Ms. Hatzenbuehler, although he later denied it.

"The Commission, in accordance with Rule 620 of the Rules of the Supreme Court Relating to Judicial Conduct, finds the charges set forth in Count I of the Notice of Formal Proceeding and Amended Notice of Formal Proceeding have been proven by clear and convincing evidence.

"Count II, Docket #173

"(1) While there is evidence to support the allegations in Count II of the Amended Notice of Formal Proceeding, the Commission finds the charges of Count II have not been proven by clear and convincing evidence.

"Count III, Docket #173

"(1) As indicated previously, on September 28, 1978, the Reno County Bar Association had a noon luncheon meeting at the Royal Inn, Hutchinson, Kansas. During that meeting a motion was made by John Shaffer and seconded by Michael Chalfant to have the Bar Association as a group go on record in favor of retaining the non-partisan method of selection of judges. The non-partisan selection method was currently in effect in Reno County, but a proposition to return to election of judges was to be on the ballot of the November, 1978, election.

"(2) Respondent was present at the meeting, and presided as the Association's president. The motion endorsing the selection and appointment method was sustained by an overwhelming vote of approximately 30-3. Respondent personally opposed non-partisan selection of judges. One reason for his opinion was that Respondent felt the voters should elect judges, but Respondent admitted he was also of that opinion because he personally would have no chance of being appointed to a district court position under the selection method of appointment. The District Court Judge for Division One of the 27th Judicial District had been selected, and had been selected at a time when Respondent was an Associate District Court Judge.

"(3) There was clear and convincing evidence that Respondent had voiced his feelings that under the existing non-partisan selection method he would have no chance of advancing to a position as a district court judge.

"(4) There was testimony from various sources, including from attorneys who had practiced in Reno County from five (5) to twenty-eight (28) years, from District Court Judge Porter Brown and from Respondent's counsel's partner, that leads the Commission to conclude that while not every attorney who appeared in Respondent's court after the September 28th vote was treated differently than prior to the vote, certain attorneys were treated differently.

"(5) Respondent's personal feelings concerning the political issue of the manner of selection of judges affected his treatment of those attorneys and the outcome of certain of their cases.

"(6) For a period of time following the September 28th vote Respondent allowed his personal feelings about the selection of judges to interfere with and affect his decisions, affect the manner in which he disposed of cases which he heard, and the manner in which he conducted his office.

"(7) The testimony of witnesses O'Sullivan (the County Attorney since April, 1977), Forker (an attorney with twelve years experience), Childs (an attorney with five years experience), and Oswalt (an attorney with twenty-eight years experience) clearly sustains that conclusion.

"(8) The issue was important and serious enough that it caught the attention of Judge Porter Brown who testified that Respondent was displeased at the Bar Association's vote on September 28 and therefore reacted towards some attorneys for a period of a few days thereafter.

"(9) Respondent's reaction was severe enough that Mr. Childs altered the manner in which he handled cases and even considered asking one of his senior partners to take over a case before Respondent.

"(10) Respondent's reaction was also reflected in his statement to Mr. Hyter, which the Commission believes was made although denied by Respondent, shortly after the meeting on the 28th 'tell Mike (Mike Chalfant, Mr. Hyter's partner and one of Respondent's co-counsel) from now on it's by the book.'

"(11) Respondent's emotional reaction to the Bar Association vote and its impact on the manner in which he conducted his judicial duties is also reflected in the testimony that he kept a list of contributors to the election on his desk for a period of time and tossed it toward Mr. Oswalt, who was one of the contributors, with the comment 'here they are' referring to the lawyers who contributed and also that 'he hoped that we were happy that the silk stocking group had their way now.'

"(12) Respondent sought to prove that a list of contributors which Respondent admittedly had in his possession after December 28th on the official form used to report contributions, was not available until December 28 and 29, 1979, about a month after Mr. Oswalt reported a list being tossed at him.

"(13) But, Mr. Oswalt testified very convincingly that the list he saw was different, on different paper, and not on an official form.

"(14) No reason has been advanced why Mr. Oswalt would be in error in his testimony and from the two times he appeared before the Commission he gave the appearance of accurately reporting what had occurred.

"(15) The members of the Commission are satisfied that Respondent had in his possession a list other than Exhibit 6 (the official list prepared by Michael Chalfant in late December); that this other list was at least a partial list of contributors to the non-partisan selection committee; that this other list was in fact shown to Mr. Oswalt by Respondent and is the one (and Exhibit 6 is not the one) to which Mr. Oswalt was alluding in his testimony.

"(16) The Commission believes Mr. Oswalt's testimony, and also that of witnesses Forker, Childs, O'Sullivan, Hyter and Judge Brown and therefore finds pursuant to Rule 620, as set forth previously, that the charges of Count III of the Amended Notice of Formal Proceeding have been proven by clear and convincing evidence.

"Count IV, Docket #173

"(1) On March 28, 1979, a man named Earl Urban was tried and found guilty before Respondent.

"(2) He was fined and sentenced to one (1) year in the Reno County jail and was so confined on the 13th day of June, 1979.

"(3) On July 26, 1979, complaints were filed in the District Court of Reno

County, Kansas, in cases No. 79-CR-357 and 79-CR-356 charging that on the 13th day of June, 1979, Earl Urban, George Joe Tate, and Gary Kepka, committed the crime of aggravated sodomy while in the Reno County jail.

"(4) The complaints for all three defendants were filed with Respondent and arrest warrants issued under his signature.

"(5) Subsequently, the case against Mr. Tate after being dismissed was refiled August 24, 1979, case No. 79-CR-413.

"(6) The charges involved in those three cases arose out of an incident occurring at the Reno County jail and allegedly involving the three named defendants, Urban, Tate and Kepka.

"(7) On August 6, 1979, Respondent issued an order setting Mr. Urban's preliminary hearing in 79-CR-356 for August 23, 1979. However, on August 20, 1979, a date when Respondent and his counsel appeared in Topeka, Kansas, for a pre-hearing conference in this case, the defendant, Urban, appeared with counsel before Judge J. Stanley Hill of Division 2 of the District Court of Reno County, Kansas, and plead guilty to a reduced charge of battery, a class B misdemeanor.

"(8) The Court file (Examiner's Exhibit 3) reflects that on the same date, Judge Hill authorized a work release and probation for Mr. Urban.

"(9) Since Mr. Urban was still confined in the Reno County jail pursuant to the sentence ordered in his DWI case, No. 78-TR-6293, a request for work release was made in that case by written motion on August 23, 1979.

"(10) The request was heard by Respondent on September 11, 1979. Respondent took the matter under advisement and filed a written opinion denying work release on September 12, 1979.

"(11) From the testimony and the Court files which have been received in evidence, it is uncontroverted that on September 12, 1979, when the written memorandum opinion denying work release in Mr. Urban's traffic case was filed, the criminal case alleging one count of aggravated sodomy was pending against Mr. Tate in the District Court of Reno County, Kansas.

"(12) Mr. Tate's preliminary hearing had originally been set for September 10, 1979, but was continued by Respondent at counsel's request to October 16, 1979.

"(13) The Court files (Examiner's Exhibits 1 and 2) reflect that Mr. Tate's case was assigned to Position No. 1 of the District Court of Reno County, Kansas, Respondent's Court. That preliminary hearing was held on October 16, 1979, although Respondent did not preside because he was otherwise occupied with other litigation, and Mr. Tate was bound over to the District Court.

"(14) Commencing on December 18, 1979, Mr. Tate's case was tried to a jury which found him guilty on December 20, 1979.

"(15) The record is also clear that on September 12, 1979, the criminal case pending against Mr. Kepka involving two charges of aggravated sodomy was pending in the District Court of Reno County, Kansas, for trial, originally being set for trial September 24, 1979, and not tried until December 18, 1979.

"(16) Mr. Kepka was likewise found guilty as charged on the 20th day of December, 1979, in a trial conducted before the Hon. Porter Brown, Judge of Division 1 of the District Court of Reno County, Kansas.

"(17) The record is clear that on September 12, 1979, at a time when Mr. Kepka's case was awaiting jury trial and Mr. Tate's case was awaiting preliminary hearing in Respondent's court, Respondent issued his memorandum opinion denying Mr. Urban's request for work release in the traffic case No. 78-TR-6293.

"(18) That memorandum opinion which was admittedly made by Respondent reads as follows:

" 'Now on this 11th day of September, 1979, the above matter comes on for hearing to the Court on the motion of the Defendant for work release. The State is present by the Assistant County Attorney, Timothy Chambers. The Defendant is present in person and by his attorney, Steven Childs. Arguments are made, and the matter is taken under advisement.

" 'On March 28, 1979, the Defendant was sentenced to one year in the Reno County Jail in the above matter, and also fined in the amount of $250.00 plus costs. This is not the first case involving the Defendant in Reno County. He comes not as a stranger to the Court.

" 'In fact, as recently as July 26, 1979, this Defendant was charged by the Reno County Attorney's Office with the felony crime of attempted aggravated sodomy. He, along with two other jail inmates, participated in a mock trial involving the young victim. After being found guilty, the young man was kicked, beaten severely, and forced into anal and oral intercourse.

" 'For his cooperation with the Reno County Attorney's Office, this Defendant was rewarded with the reduced charge of simple battery. He pleaded guilty to this reduced charge on August 20, 1979, before Judge J. Stanley Hill. Judge Hill sentenced him to six months in the County Jail with the further reward or privilege of work release.

" 'It appears that part of Mr. Urban's reward for his participation and cooperation in the above scenario was to be a recommendation, by the County Attorney's Office, in the case at hand, for a work release on the remainder of his sentence.

" 'This Court will not participate in the rewarding of Mr. Urban for his participation in the rape and beating of the young inmate. It will not further reward Mr. Urban for his cooperation with the County Attorney's Office in allowing him to escape from answering to the original charge in said matter. In short, the motion for work release is denied, and the Defendant is ordered to serve the remainder of his sentence.' (Respondent's Exhibit 4)

"(19) Not only did Respondent issue that memorandum opinion, but he hand-delivered a copy of it to a news reporter, Randy Atwood, of the Hutchinson News, and mailed a copy of the same opinion to Ken Willard, news director of KWHK, a Hutchinson news station, and to Jerry Bohnan of Radio station KWBW.

"(20) The opinion itself supports the finding that Respondent stated as fact conclusions relating to the alleged crimes committed by Mr. Tate and Mr. Kepka.

"(21) Respondent also, in the memorandum opinion, expressed his opinion as to the wisdom and/or propriety of the disposition of the criminal case involving Mr. Urban.

"(22) The Commission reads the opinion as being critical of the action taken both by the Reno County Attorney's office, and District Judge J. Stanley Hill. From Respondent's testimony before the Commission on April 28 and 29, 1980, it is clear that Respondent did not approve of the action taken by the County Attorney's office in reducing Mr. Urban's charge.

"(23) It was also clear that Respondent intended to write the opinion in the manner he did and intended to cause it to be disseminated to the news media.

"(24) Respondent's reasons for writing the opinion in the manner that he did were that he felt that there was a situation concerning overcrowding that was occurring in the jail that led to the alleged crime involved in the Urban, Tate and Kepka cases and because he indicated that he was required by law to state his reasons for denying work release.

"(25) Serious criminal charges were pending, including one case pending before Respondent, involving the same circumstances which he recited in his memorandum opinion, at the time he wrote and disseminated the memorandum opinion.

"(26) The Commission finds the charges contained in Count IV of the Amended Notice of Formal Proceeding have been proven by clear and convincing evidence.

"Docket #197

"(1) Sheriff James Fountain testified that on January 5, [1978], as he was walking in the hallway of the Law Enforcement Center in Hutchinson, he was approached by Respondent who said words to the effect 'let's go down to Convention Hall right now and put the shoes and gloves on and get this straightened out man-to-man.'

"(2) On January 4, [1978], at a time when Sheriff Fountain was out of town, his son was convicted following a plea of the charge of DWI and speeding and was sentenced pursuant to law by Respondent.

"(3) Respondent took a motion for probation under advisement and the Fountain boy spent that night in jail.

"(4) It is uncontroverted that there was a conversation between Respondent and the Sheriff on January 5, [1978].

"(5) The Sheriff had tried to contact Judge Rome at home on the evening of January 4, concerning what had occurred in Court and attempted to inquire of the Judge what had happened in Court on the 5th.

"(6) It was in response to the Sheriff's inquiry that Respondent made the statement.

"(7) Respondent denied making the statement recited by Sheriff Fountain.

"(8) The Sheriff's testimony, however, is corroborated by the County Attorney, Joe O'Sullivan who testified that contemporaneously with the alleged making of the statement, Sheriff Fountain came to his office and repeated the statement to Joe O'Sullivan.

"(9) Mr. O'Sullivan indicated that the Sheriff's apparent reaction to the statement was one of shock.

"(10) Mr. O'Sullivan further corroborated the Sheriff's testimony by indicating that subsequently the same day, Respondent admitted to Mr. O'Sullivan making the statement.

"(11) Mr. O'Sullivan could not remember the exact details of that conversation, but indicated Respondent confirmed what the Sheriff had said to be true.

"(12) Mr. O'Sullivan indicated that the Judge was irritated that the Sheriff had been trying to contact him concerning his son.

"(13) Based on the corroborated testimony of Sheriff Fountain and County Attorney O'Sullivan, the Commission finds that it has been proven by clear and convincing evidence that Respondent made the statement attributed to him by the Sheriff in the Notice of Formal Proceeding to the effect that 'let's go down to Convention Hall and put the gloves and shoes on and get this straightened out man-to-man.'

"(14) Respondent denied that he made the alleged statement and gave reasons why he thought the County Attorney and the Sheriff had conspired to lie against him. No credible evidence giving any reason why either the Sheriff or the County Attorney would lie has been introduced.

"(15) As a matter of fact, Respondent himself testified that his relationship with each man was good and that no hostility was evident.

"From the evidence presented to it in the four (4) days of evidentiary hearing, from listening to Respondent's testimony at both hearings, from a review of the record at the November 5 and 6, 1979, hearings by the Commission, including Commissioners Arn and Riggs, from observing Respondent's demeanor while testifying, from observations of witnesses called by the Examiner who did not have any apparent motivation to lie about Respondent, the Commission finds that it cannot and does not believe Respondent's explanations of the various incidents set forth previously. The Commission therefore, pursuant to Rule 620, finds that the charges as contained in the Amended Notice of Formal Proceeding, Docket #173, Counts I, III and IV have been sustained by clear and convincing evidence and that the charges contained in the Notice of Formal Proceeding in Docket #197 have been sustained by clear and convincing evidence.

## "CONCLUSIONS OF LAW

"The Commission therefore concludes:

"(1) Concerning Count I, Docket #173, of the Amended Notice of Formal Proceeding that Respondent violated the provisions of Canons 1 and 2 in that he acted in a manner that did not promote the public confidence in the integrity and impartiality of the judiciary and allowed his personal views or appeared to allow his personal views on the political issue of selection of judges to influence his judicial conduct or judgment.

"(2) The Commission further concludes concerning Count II, Docket #173, that it should be dismissed inasmuch as the Commission has determined that the factual allegations of the Amended Notice of Formal Proceeding are not clearly and convincingly supported by the evidence.

"(3) The Commission further concludes concerning Count III, Docket #173, of the Amended Notice of Formal Proceeding that Respondent violated the provisions of Canons 2 and 3 (A) (1) in that he acted in a manner that did not promote the public confidence in the integrity and impartiality of the judiciary and allowed his personal views or appeared to allow his personal views on the political issue of selection of judges to influence his judicial conduct and judgment.

"(4) The Commission further concludes concerning Count IV of the Amended Notice of Formal Proceeding that Respondent's actions as found previously violated Canons 2 and 3 (A) (3) and 3 (A) (6) of the Canons of Judicial Conduct.

"The Commission concludes that Respondent purposefully attempted to be critical of actions of the County Attorney by writing the memorandum decision in the way that he did and also critical of the actions of fellow Judge J. Stanley Hill in authorizing a work release. The Commission specifically finds that Respondent purposefully made allegations of fact and stated as conclusions factual matters that were at the time he made his statements being contested in two criminal cases, one of which was before him, and one of which was awaiting jury trial in the District Court of Reno County, Kansas, and subsequent to making such

statements then purposefully and intentionally tried to get them publicized by delivering a copy and mailing a copy to the news media in Hutchinson, Kansas. The Commission concludes that Respondent's actions were purposeful and intentional.

"The testimony of Respondent as to his explanation of why he wrote the memorandum opinion demonstrates clearly that he does not have the judicial temperament required by the Canons of Judicial Conduct and that he purposefully utilized the opportunity of writing the memorandum opinion to publicly scold the County Attorney's office, a fellow District Judge, and to bring attention to what he considered to be a public political issue.

"(5) The Commission concludes concerning the allegations of Count I of Docket #197 based on the findings of fact set forth previously that the Respondent violated the provisions of Canons 1 and 2 (A), with conduct that tends to degrade the integrity of the judiciary and certainly does not promote public confidence in the judiciary.

### "RECOMMENDATIONS

"Based on the foregoing Findings of Fact and Conclusions of Law, and in accordance with Rule 620 of the Rules of the Supreme Court Relating to Judicial Conduct, the Commission on Judicial Qualifications recommends the discipline of removal.

"Dated this 5th day of June, 1980."

The standard of proof to be applied to an inquiry relating to judicial conduct is that of clear and convincing evidence. *In re Rome*, 218 Kan. 198, Syl. ¶9. Respondent argues there is no clear and convincing evidence to support the Commission's findings and conclusions that he violated the respective canons. We have carefully examined the voluminous transcripts and exhibits herein and conclude the Commission's findings and conclusions are supported by clear and convincing evidence. We accept and adopt the findings and conclusions of the Commission.

We turn now to the question of the discipline to be imposed. The Commission has unanimously recommended the removal of respondent from office.

The violations herein are in sharp contrast to the violation involved in respondent's previous disciplinary proceeding (*In re Rome*, 218 Kan. 198). The earlier violation arose from the writing of a memorandum decision in poetic form. The poem was an injudicious attempt at humor, but, as this court stated at 208, "nor can it be said the memorandum decision was written with deliberate intent to harm anyone." The deliberate intent to harm is present in the violations herein and no one contends anything was said or done in jest.

A judicial disciplinary proceeding is an inquiry into the con-

duct of the judicial officer, the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual. *In re Rome* at 204. Judges, like all their fellow human beings, have varying degrees of judicial skills and abilities. At the very least the public can expect its judges to be fair and impartial. The public may decline to do business with an attorney—no like option exists as to a judge.

Partiality in the determination of cases is one of the gravest charges that may be leveled against a judge. Partiality arising from judicial vindictiveness is particularly opprobrious.

The respondent denies the occurrence of all of the acts which are the basis of the proceeding herein except for the written decision in Count IV. Consistent therewith, no evidence of mitigating circumstances has been offered by respondent except as to Count IV. Even there one cannot really characterize respondent's explanation of the purpose of the memorandum as evidence of mitigation. Had evidence of mitigating circumstances been offered it is difficult to see how the result herein could have been altered. As the California Supreme Court stated in *Cannon v. Commission on Judicial Qualifications,* 14 Cal. 3d 678, 707, 122 Cal. Rptr. 778, 537 P.2d 898 (1975):

"[W]e cannot 'conceive that there are circumstances in which bad faith itself can be excused by extraneous circumstances. There can be no mitigation for maliciously motivated unjudicial conduct. . . .' (*Spruance v. Commission on Judicial Qualifications,* 13 C.3d 778, 800 [119 Cal. Rptr. 841, 532 P.2d 1209 (1975)].)"

The findings and conclusions herein clearly demonstrate respondent's lack of judicial temperament. The court acknowledges receipt of four letters from attorneys, each dated January 15, 1981, relative to the disposition of this proceeding, which have been submitted by respondent.

This court concludes it has no alternative but to accept the Commission's recommended discipline of removal. Because it is our duty to preserve the integrity and independence of the judiciary (Code of Judicial Conduct, Canon 1), we order Judge Richard J. Rome removed from office. This order is final forthwith.